1             IN THE DISTRICT COURT OF GUAM

2               TERRITORY OF GUAM

3                  * * *

# FILED

**DISTRICT COURT OF GUAM**

**OCT 24 2006**

**MARY L.M. MORAN
CLERK OF COURT**

4

5

6

7

8

9   UNITED STATES OF AMERICA,  ) **COURT OF APPEALS**

10             Plaintiff,  )    **CASE NO. 06-**
                         )

11      vs.                 )CRIMINAL CASE
                         )    NO. CR05-00053

12   BRIAN WILLIAM ELM,        )

13            Defendant.  )
    - - - - - - - - - - - - - - - - - - - - - - - - - - )

14

15

16

17             TRANSCRIPT OF PROCEEDINGS

18                 BEFORE

19       THE HONORABLE JOHN C. COUGHENOUR

20           Designated District Judge

21

22         **DEFENDANT'S TRIAL TESTIMONY**

23         **MONDAY, MAY 15, 2006**

**US Attorney's Office
Districts of Guam & NMI**

OCT 25 2006

Time _____ 3pm
Receiving name _____
Date keyed in Dbase ___ 10/25
Entered into Dbase by:

24

25

Wanda M. Miles
Official Court Reporter
District Court of Guam

**GOVERNMENT
EXHIBIT
2**

**APPEARANCES:**


FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                          BY:  KARON V. JOHNSON, Esq.
                          ASSISTANT UNITED STATES ATTORNEY
                          Suite 500, Sirena Plaza
                          108 Hernan Cortez Avenue
                          Hagatna, Guam  96910


FOR THE DEFENDANT:        LAW OFFICES OF VAN DE VELD,
                                SHIMIZU, CANTO & FISHER
                          BY:  CURTIS C. VAN DE VELD, Esq.
                          167 East Marine Corps Drive
                          Hagatna, Guam  96910


---------------------------------------------

**I-N-D-E-X**

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Brian W. Elm | 4 | 41 | 67 |

**E-X-H-I-B-I-T-S**

| GOVERNMENT EXHIBIT | INTRODUCED/ADMITTED | |
|---|---|---|
| 7 - Phone records | 16/24/54 | |
| 8 - Phone & deposit records | 20 | |
| 14 - Phone & deposit records | 23 | |
| 13 - Phone & deposit records | 24 | |
| 12 - Phone & deposit records | 26 | |
| 11 - Phone & deposit records | 28 | |
| 9 - phone & deposit records | 29 | |
| 10 - phone & deposit records | 31 | |
| 31 - (Court documents relating | 41/68 | 42 |
| 32 - (to Defendant B. Elms' | 41 | 42 |
| 33 - (felony convictions | 41 | 42 |
| 34 - Plea agreement | 42 | |
| 26 - Phone records | 58 | |
| 4 - Phone records | 62/67 | |
| 28 - phone records | 64 | |

1       HAGATNA, GUAM; MONDAY, MAY 15, 2006

2                      *  *  *

3           (BRIAN WILLIAM ELM, the defendant herein, was

4    first duly sworn and testified as follows:)

5           THE CLERK:  Take the stand.

6           State your full name and spell your last name.

7           THE DEFENDANT:  Brian William Elm, E-L-M.

8                  DIRECT EXAMINATION

9    BY MR. VAN DE VELD:

10      Q.   Brian, why don't we first start off, I want to

11   talk to you about your work history.  Can you please

12   explain to the jury what your work history was; let's

13   start with the beginning of January of 2004.

14      A.   The beginning of January 2004, uhm, I worked

15   at -- or I wasn't working at the time.  I think it's

16   January -- July I worked at Marriott, and I worked

17   there for approximately two weeks.  And after I worked

18   there I went to work at Okura Hotel, from August to

19   December of 2004.  And off and on I'll be working down

20   at the office, Reaction, Eric's father's, uh, his --

21   the office they opened down there, in Agana.

22      Q.   And when did that start, that you would work

23   on and off at the Reaction office?

24      A.   Well, basically, Eric would just ask me to

25   help him out, and on occasions, but then I started

1    working there like on a full time basis on January to

2    February of 2005.

3        Q.    Did you report all changes in your employment

4    status to anyone?

5        A.    Yes, I did.

6        Q.    Who did you report them to?

7        A.    To my probation officer.

8        Q.    When did you start that pretrial probation

9    monitoring?

10       A.    I believe it's in September of 2003.

11       Q.    What caused that reporting to start?

12       A.    I got arrested for possession, and possession

13   of firearm.

14       Q.    You said you got arrested for possession and

15   possession of a firearm.

16       A.    Yes.

17       Q.    When you say you got arrested for possession,

18   what do you mean?

19       A.    They had found a, uh, straws in a backpack I

20   was carrying, and a pipe.

21       Q.    Okay.  And what was inside the straws?

22       A.    Uh, residue, from meth.  Meth residue.

23       Q.    And whose backpack was it?

24       A.    It was my backpack.

25       Q.    And do you know how long those items had been

1   in your backpack?

2       A.   Uhm, maybe two days.

3       Q.   So at that time you had been using; is that

4   correct?

5       A.   Yes.

6       Q.   Okay.  Following your arrest, when was the

7   next time you used ice?

8       A.   I didn't use ice after that.

9       Q.   Now, in 2003, what kind of a vehicle did you

10  own?

11      A.   I owned a Yamaha, '01 model, it was a YZF600R.

12      Q.   Okay.  Was that a car or a motorcycle?

13      A.   I owned a 1998 Nissan Altima before that; in

14  early 2003, I sold it and I got the Yamaha motorcycle.

15      Q.   Okay.  Do you recall how much you sold the

16  Nissan Altima for?

17      A.   $8,000.

18      Q.   And who did you sell it to?

19      A.   Vince Cruz.

20      Q.   Is that Vince Cruz from Merizo?

21      A.   No, he was from Dededo.

22      Q.   And you said you sold it for $8,000.  How much

23  did you buy the motorcycle for?

24      A.   5,000.

25      Q.   So what did you do with the difference?

1     A.   I just saved it.

2     Q.   Did there come a period of time when you

3  acquired a different vehicle?

4     A.   Yes, in early 2004 I had sold my Yamaha, the

5  one I bought for 5,000, I sold it for 4,000 to a guy

6  named Jess from Barrigada.

7     Q.   You sold the motorcycle for 4,000, and what

8  did you buy?

9     A.   I bought a, the Suzuki motorcycle from Eric

10  Aponik for 4,000, but I gave his dad 1500 for the bike

11  because Eric I believe owed his dad money, so, I gave

12  him $1500, and I used the remaining to buy rims for

13  Keomi's runner, 4Runner.

14     Q.   So that I understand this correctly, are you

15  saying you gave 4,000 to Eric, a $1,500 to his father,

16  and then you used the difference?

17     A.   No, I gave -- they had -- we agreed that I was

18  going to buy the bike for 4,000, but I gave, instead I

19  gave them 1500 and I asked them if I can work off the

20  difference, and the remaining I used to purchase the

21  wheels for the Runner, Keomi's Runner.

22     Q.   Did there come a time when you bought a

23  different vehicle?

24     A.   Yes.

25     Q.   When was that?

1    A.   Uhm, I believe it was either late 2004 or

2  early 2005.

3    Q.   What did you buy?

4    A.   I had purchased a -- I sold my, the motorcycle

5  I bought from Eric to Chris for 7500, and I bought a

6  Toyota, white Toyota 4Runner which I purchased for

7  $6,000.

8    Q.   So, you were able to sell the motorcycle that

9  you had acquired from Eric for a profit; is that

10  correct?

11    A.   Yes, that's correct.

12    Q.   And then you used part of the money that you

13  received to buy the white 4Runner?

14    A.   Yes.

15    Q.   Okay.  What did you do with the additional

16  money that you had from the sale of the motorcycle

17  after buying the 4Runner?

18    A.   I don't remember what I did.

19    Q.   Okay.  Did you make any improvements to the

20  white 4Runner?

21    A.   Oh, the rims that were on Keomi's Runner, the

22  stock wheels, I put it on the white 4Runner.

23    Q.   Okay.  So, after you had purchased the other

24  rims for Keomi's 4Runner --

25    A.   Yes.

1          Q.    -- that were the previous ones that were on

2     the car at the time --

3          A.    Yes.

4          Q.    -- that were left over, is that what you're

5     saying?

6          A.    Yes.

7          Q.    And you took those rims and you put them on --

8          A.    The white 4Runner.

9          Q.    -- the white 4Runner that you purchased?

10         A.    Yes.

11         Q.    Did you do anything else to improve the white

12    4Runner?

13         A.    Yes, I had purchased sounds.

14         Q.    Where did you buy the sound system?

15         A.    Uttam's.

16         Q.    Do you remember how much you spent?

17         A.    About a thousand some; don't remember.

18         Q.    How long did you own the white 4Runner?

19         A.    Less than a month.

20         Q.    Who did you sell it to?

21         A.    I sold it to Eric Aponik.

22         Q.    Why did you sell it to him?

23         A.    I wanted to purchase his cousin's motorcycle.

24         Q.    How much did you sell it to Eric for?

25         A.    7,500.

1    Q.    Were you paid in cash?

2    A.    Yes.    He actually gave me six thousand and

3    said he would pay me the rest later.

4    Q.    How much did you buy the motorcycle for?

5    A.    I believe it was seven, or seven -- 7500.

6    Q.    And who did you buy that from?

7    A.    John Dudkiewicz, Eric's cousin.

8    Q.    When you started working on and off at

9    Reaction Supply Company, how much were you earning?

10    A.    It varies, it depended on how -- how long I

11    stayed at work.    About, they would pay me $10 an hour.

12    Q.    Was that both before you started working there

13    regularly, or just during the period of time that you

14    were on and off?

15    A.    During the period of time when I was off and

16    off.

17    Q.    How much did you make when you started working

18    there in January of 2005?

19    A.    About four to five hundred dollars a week.

20    Q.    Do you know John Vincent Cruz from Merizo?

21    A.    Yes, I do.

22    Q.    How do you know John?

23    A.    Uhm, like barbecues I go to in Merizo, or my

24    cousin Katrina, that's her *pare*.

25    Q.    How long have you known John?

1     A.    About five, five years, six years.

2     Q.    Did there come a time when you -- you said you

3 used to see him when you would go to barbecues.  Did

4 there come a time when you became more familiar with

5 Mr. Cruz?

6     A.    No.

7     Q.    When you worked at Reaction Supply, how often

8 would you see Mr. Cruz at the premises of Reaction

9 Supply?

10     A.    Uhm, I saw him there a couple of times, maybe

11 two or three times.

12     Q.    And when you saw him there, what was occurring

13 that caused him to be there, that you were aware of?

14     A.    He would just be talking to Eric Aponik.

15     Q.    Do you know Jonathan Canovas?

16     A.    Yes.

17     Q.    How do you know Johathan Canovas?

18     A.    My cousin Derek used to bring him around when

19 we had barbecues and stuff like that, family

20 gatherings.

21     Q.    Did you come to know him better over some

22 period of time?

23     A.    Yes.

24     Q.    Can you explain that?

25     A.    Well, sometimes he would call my phone to, to

1    try and get ahold of Eric, and he would just start

2    talking to me about stuff.

3        Q.    When did he start calling you trying to get

4    ahold of Eric through you?

5        A.    Like in -- I'm not sure.

6        Q.    You've seen some of the phone records that the

7    government has provided in this case, is that correct?

8        A.    Yes.

9        Q.    And you've seen that some of the phone calls

10   are like six minutes, some are up to 15 minutes?

11       A.    Yes.

12       Q.    What kinds of things would he talk to you

13   about in those phone calls?

14       A.    Well, most of the time he'll be out in a bar

15   or in a casino gambling and he'll just tell me about,

16   you know, what he's doing.  And he used to tell me that

17   his friends just leave him and he's lost, he don't know

18   where he's at.  Calls me when he walks the strip in

19   Vegas.

20       Q.    And what did he talk to you about?

21       A.    Just that his friends left him with some

22   people, and he's trying to look for them.

23       Q.    Did you ever talk to him about drugs?

24       A.    No.

25       Q.    So, if he calls you looking for Eric, what

1   would you do?

2       A.   I would, uh, try and get ahold of Eric for

3   him, and I'll tell him just call me back.

4       Q.   You'd tell who to call you back?

5       A.   Jonathan Canovas.

6       Q.   Did you know why he was trying to get ahold of

7   Eric?

8       A.   No.

9       Q.   The cell phone that Keomi got for you from

10  i-Connect, were you the only one who used that phone?

11      A.   No.

12      Q.   Who else would use it?

13      A.   Sometimes Eric would use the phone.

14      Q.   Why would Eric use your phone at times?

15      A.   His batteries are weak on his phone.

16      Q.   So, his batteries are weak.  I'm not -- I

17  don't understand that.

18      A.   Well, sometimes his phone is dead.

19      Q.   So his phone wouldn't be usable?

20      A.   Yes.

21      Q.   So he would use your phone, is that what

22  you're saying?

23      A.   Yes.

24           (Pause to gather up exhibits.)

25           MR. VAN DE VELD:  Your Honor, may I approach

1    the witness?

2             THE COURT:  Yes.

3             MR. VAN DE VELD:  Thank you.

4        Q.   First I'm showing you what's marked as Exhibit

5    1; and do you recognize what's depicted in Exhibit 1?

6        A.   No, I don't.

7        Q.   And have you ever seen a package similar to

8    that?

9        A.   No, I don't.

10       Q.   Now, I'm now showing you what's marked as

11   Government Exhibit No. 5, ask if you can take a look at

12   that.

13       A.   (Witness complies.)

14       Q.   Those are deposit slips for the Bank of Guam;

15   have you ever seen any of those before?

16       A.   No.

17       Q.   Have you ever deposited money into a bank

18   account for Johathan Canovas?

19       A.   No.

20       Q.   Have you ever accompanied anyone to deposit

21   money into the bank account of Johathan Canovas --

22       A.   No.

23       Q.   -- at Bank of Guam?

24            Have you ever given money to anyone for the

25   purpose of depositing money into the bank account of

```
1    Johnathan Canovas?

2        A.    No.

3        Q.    Have you ever wired money from any account

4    that you have to Johathan Canovas?

5        A.    No.

6        Q.    Have you ever given money to anyone to wire

7    transfer via Western Union money to Johathan Canovas?

8        A.    No.

9        Q.    Have you ever given money to someone to

10   deposit into a bank account for Christopher Espinosa?

11       A.    No.

12       Q.    Have you ever given money to anyone and

13   instructed them to wire money to Christopher Espinosa?

14       A.    No.

15       Q.    Have you ever received packages in the mail

16   from Johathan Canovas that contained controlled

17   substances in them?

18       A.    No.

19       Q.    Have you ever received packages from

20   Christopher Espinosa that contained controlled

21   substances in them?

22       A.    No.

23             (Pause.)

24             THE COURT:  Let's take a morning recess, 15

25   minutes.
```

```
 1              (Recess was taken at 10:46 a.m.)

 2              THE COURT:  This your last witness?

 3              MR. VAN DE VELD:  Yes, Your Honor.

 4              THE COURT:  Do you anticipate any rebuttal?

 5              MS. JOHNSON:  Possibly, I'm not sure.

 6              (The jurors are now entering the courtroom.)

 7              THE COURT:  Go ahead and be seated folks.

 8  BY MR. VAN DE VELD:

 9      Q.    Brian, I'm showing you what's marked as

10  Exhibit No. 7 and I'm directing your attention to the

11  first page where it starts listing incoming telephone

12  numbers.

13              Now, according to the chart these your phone

14  calls with Eric Aponik, and on the first page it

15  indicates several phone calls between you and Eric

16  Aponik.  Can you tell me whether or not that was

17  something which was unusual?

18      A.    No.

19      Q.    Why?

20      A.    Can you repeat the question again?

21      Q.    Yes.  It indicates --

22              MS. JOHNSON:  Objection.  Could counsel go

23  back to the microphone?  I can't hear him.

24              MR. VAN DE VELD:  Okay.

25      Q.    Take a look at the first page, it shows
```

1  telephone numbers, it shows telephone calls between you

2  and Eric over the course of several days.  Was that

3  something which was unusual?

4      A.   No.

5      Q.   Why?

6      A.   We -- we call each other all the time.

7      Q.   And what would you call each other about?

8      A.   Like what we would do after work or, you know,

9  what we're doing, what he's doing, what I'm doing.  I'm

10 basically -- I just -- if I'm the one calling him it's

11 because I'm bored, I sit there at work and like if

12 there's nobody in the pool, I would just start calling.

13     Q.   So you said and if you're at the pool and

14 there's nobody in the pool and you're bored, you just

15 start calling?

16     A.   Yes.

17     Q.   Was Eric the only one that you called or other

18 people?

19     A.   There's other people.

20     Q.   Who else would you call?

21     A.   I call Keomi, I call my cousins, I call my

22 brother, family.

23     Q.   Now, if you turn further into the exhibit

24 there's another page that I've put a Post-It note flag

25 on.  What page is that?

1     A.    Page 8.

2     Q.    Okay.  On there it indicates phone calls that

3  came from Johathan Canovas; do you recall receiving

4  those phone calls?

5     A.    From Johathan Canovas?

6     Q.    Yes.

7     A.    Is that page 8?

8           MR. VAN DE VELD:  May I approach, Your Honor?

9           THE COURT:  Yes.

10    A.    Or 7?

11              (Defense counsel went to the witness

12               stand to help the witness.)

13    A.    Okay.

14    Q.    Do you recall receiving those phone calls?

15    A.    I can't say.

16    Q.    Okay.  If you go back to the earlier pages

17 there, it indicates, for example, a blocked telephone

18 number, and then it will indicate a call, and the

19 duration of the call; do you see that on the bill?

20    A.    Yes.

21    Q.    And do you know why it is that it reflects

22 that?

23    A.    No.

24    Q.    Okay.  Have you ever received a phone call

25 where the sender on the cell phone doesn't want the

1  number that they're calling from to be shown?

2     A.   Uh, yes.

3     Q.   Okay.  And when that happens, what does it

4  show on your cell phone?

5     A.   I believe blocked.

6     Q.   But the phone call still appears on your bill

7  for the time that you spent on the phone?

8     A.   Yes.

9     Q.   Is that correct?  Also shown in the records in

10  blue highlight are some phone calls from John Vincent

11  Cruz; do you recall receiving those phone calls?

12     A.   Yes.

13     Q.   Okay.  And when you received those phone

14  calls, what conversations did you have with John Cruz?

15     A.   He would ask me how would I -- how would --

16  how is it that he would be able to get ahold of Eric

17  Aponik.

18     Q.   And what would you tell him?

19     A.   I would just say try calling his house or his

20  cell phone.

21     Q.   Okay.  Now some of the phone calls reflect

22  that they would -- that they occurred during the

23  daytime.  So where would you have been when you

24  received those phone calls, in let's say the months of

25  October and November and December of 2004?

1    A.    At work.

2    Q.    And where would that have been?

3    A.    Okura Hotel.

4          (Counsel approached the witness again.)

5    Q.    Showing you what's marked as Exhibit 8, I've

6    put a Post-It note with the time on it; would you

7    please take a look at Exhibit 8 tell me when you've

8    finished reviewing it?

9    A.    Okay.

10   Q.    Okay.  Now, at the top of the exhibit is an

11   indication of a deposit, and then there is this

12   indication of telephone traffic below that.  And you

13   understand that's how the exhibit works, is that

14   correct?

15   A.    Yes.

16   Q.    Okay.  But the exhibit doesn't have the time

17   on the day that the deposit was made reflected on it,

18   so I've -- from the testimony of the Bank of Guam

19   person, I've put a little Post-It note there for you

20   indicating the time.  Can you tell me the phone calls

21   that are reflected in the exhibit immediately prior to

22   and after the time shown on the little Post-It note?

23   A.    (Pause to examine exhibit.)

24          10/13/04, 10:33 a.m., Eric Aponik -- from Eric

25   Aponik through, to Brian Elm.

1    Q.   Okay.  That's at what time?

2    A.   10:33.

3    Q.   Okay.  And that's immediately after or before

4    the time on the Post-It note?

5    A.   After.

6    Q.   Okay.  And at that time, where would you have

7    been?

8    A.   At work.

9    Q.   Okay.  And the difference between the time of

10   the deposit and the time of the phone call is how much

11   time?

12   A.   Four minutes.

13   Q.   Okay.  So, if you had been with Eric Aponik

14   and given him the money to make the deposit, why would

15   he need to call you within four minutes of it?

16   A.   I wouldn't know.

17   Q.   Okay.  What about the phone call that's

18   immediately preceding that?

19   A.   Is that on 10-14?

20        MR. VAN DE VELD:  May I approach, Your Honor?

21        THE COURT:  Yes.

22        MR. VAN DE VELD:  (Approaching the witness.)

23   Q.   What's the time of the phone call that

24   immediately precedes the time of the deposit?

25   A.   9:08 a.m.

1      Q.   And who's calling who?

2      A.   I'm calling Eric.

3      Q.   Okay.  Now, do you know what that -- can you

4  recall what that phone call was about?

5      A.   Just probably checking what we're going to do

6  later on, in the evening.

7      Q.   At that time you were employed where?

8      A.   Okura.

9      Q.   Okay.  What are the hours of operation of the

10  pool at the Okura Hotel?

11      A.   From eight to six.

12      Q.   From eight in the morning?

13      A.   8:00 a.m. to 6:00 p.m.  Sometimes they open

14  until seven.

15      Q.   Okay.  How early do people start actually

16  using the pool?

17      A.   Sometimes people would come down before that,

18  but I'll be there, and I'll allow them to -- I'll be

19  there earlier and I'll allow them to swim, because I'm

20  there to monitor them.

21      Q.   What are usually the boring parts of the day?

22      A.   I'd say lunch time.

23      Q.   So, you said that you had a phone call with

24  Eric at around 9:00 o'clock, and you said you think

25  that was about finding out what he was going to do?

Case 1:07-cr-00026    Document 17-2    Filed 06/08/2007    Page 22 of 72

1    A.    Yes.

2    Q.    Okay.  How long did that phone call last?

3    A.    (Pause.)

4    Q.    Look at the record.  .

5    A.    (Complies.)  It doesn't show.

6    Q.    Was that a call from your cell phone?

7    A.    Yes.

8    Q.    Look in Exhibit 7, see if that provides the

9    duration of time.

10          (Pause to review records.)

11   A.    One minute.

12   Q.    Okay.  And about how long would it take you to

13   make a phone call to Eric to find out what's going on

14   for that evening?

15   A.    Before he answers the phone?

16   Q.    No, how long would your general conversation

17   be with Eric when you're calling him to find out what

18   he's going to do for the evening?

19   A.    One to two minutes.

20   Q.    Okay.  Show you what's marked as Exhibit 14.

21   From the testimony of the Bank of Guam person I put the

22   time of the deposits, which is 1403.  Can you tell me

23   the phone call which occurs immediately preceding that

24   time on the date of the deposit?

25   A.    11:37 a.m.

1     Q.    Okay.  And what phone call is that?

2     A.    I called Eric.

3     Q.    Okay.  And what is the phone call that occurs

4 immediately after that?

5     A.    11:42 a.m.

6     Q.    And who's calling who?

7     A.    Eric called Canovas.

8     Q.    Okay.  How long was the phone call immediately

9 preceding the deposit?

10    A.    The phone call was at 11:42 and the deposit

11 was at 1403, which is 2:03 in the afternoon.

12    Q.    And the phone call that occurred beforehand at

13 11:00, what was -- do you know what the length of that

14 phone call was?  Could you look at Exhibit 7.

15    A.    (Pause to look at documents.)

16         30 seconds.

17    Q.    Okay.  Now, do you recall receiving that phone

18 call?

19    A.    No.

20    Q.    Based on the duration of the phone call, do

21 you have any idea what you might have been talking to

22 him about?

23    A.    No.

24    Q.    Showing you what's marked as Exhibit 13,

25 please take a look at this.  Based on the information

1    from the person at Bank of Guam the deposit is at

2    10:34, the date of the deposit is 12-23.  Can you tell

3    me what the phone call is in the telephone traffic that

4    immediately precedes that date of call?

5         A.    There's none on the 23rd.

6         Q.    Just tell me the date that's reflected that is

7    the call in chronology that first precedes the date of

8    the deposit.

9         A.    12-21-04, 10:34 a.m.

10        Q.    On what day?

11        A.    The 21st.

12        Q.    So, two days beforehand, is that correct?

13        A.    Yes.

14        Q.    Okay.  And who's calling who?

15        A.    I called Eric.

16        Q.    Okay.  Do you have any idea what that phone

17   call may have been about?

18        A.    No, not that I can recall.

19        Q.    Okay.  What about the phone call that

20   immediately follows after that, can you tell us the

21   date and time of the phone call that follows that?

22        A.    12-21-04, 10:36 a.m., Canovas to myself.

23        Q.    Okay.  Do you recall what that phone call was

24   about?

25        A.    No, I don't.

1    Q.    And that -- was that the time day of the

2  deposit?

3    A.    No.

4    Q.    How many days after the deposit?

5    A.    It was about two days before the deposit.

6    Q.    So, can you tell me the phone call that occurs

7  after the deposit?

8    A.    After the deposit was 12-24-04, Aponik to

9  Brian Elm, myself.

10    Q.    Okay.  And do you know what that phone call

11  was about?

12    A.    No.

13    Q.    Okay.  And how long after the deposit was that

14  phone call made?

15    A.    Like a day.

16    Q.    Like a day after?

17    A.    A day.

18    Q.    Showing you what's marked as Exhibit 12, and

19  on Exhibit 12 from the information provided by the Bank

20  of Guam person, I put 1521 p.m. as the time of the

21  deposit shown at the top.  Can you tell me the phone

22  call that is reflected that precedes, immediately

23  precedes the date and time of the deposit, please?

24    A.    11-24-04, 8:14 p.m.

25    Q.    Now what is the time of the deposit?

```
 1        A.    The deposit was made on the 11-26, 1521, which
 2   was 3:21 p.m.
 3        Q.    Okay.  So, how much time is there between the
 4   time of the phone call immediately preceding the
 5   deposit and the time of the deposit?
 6        A.    Two days.
 7        Q.    What's the next phone call that occurs after
 8   the deposit?
 9        A.    11-24-04, 3:47 p.m.
10        Q.    The date here.
11        A.    Yes.
12        Q.    So this, you said 24?
13        A.    11-27, 10:45.
14        Q.    And that's from whom to whom?
15        A.    That was from Eric Aponik to Canovas.
16        Q.    Okay.  So, do you have any knowledge about
17   what that phone call was about?
18        A.    No.
19        Q.    And you said the one that immediately preceded
20   that was on the 26th at?
21        A.    3:48.
22        Q.    That would be -- this doesn't start -- you're
23   wrong.  Go back here, you've got 11-24, 8:14 p.m.; is
24   that correct?
25        A.    Yes.
```

1      Q.    Okay.  That's not the day of the deposit, it's

2  a day and a half before that; is that correct?

3      A.    Yes.

4      Q.    Okay.  Then the next call that's shown is on

5  11-26-04 at 3:48 p.m., and that's from whom to who?

6      A.    That was my myself to Aponik.

7      Q.    Okay.  And do you know what that phone call

8  was about?

9      A.    No.

10     Q.    Okay.  If you were with Eric at the time that

11 he made the deposit, why would he have to call you

12 within 20, 30 minutes after that?

13     A.    I don't know.

14     Q.    Okay.  Do you recall what the content of that

15 telephone conversation was about?

16     A.    No.

17     Q.    Showing you Exhibit 11, at the top of the

18 document it shows 11-19-2004 as the date of the

19 deposit, and from the testimony of the lady from the

20 Bank of Guam, it was 10:54 a.m.  Can you tell me the

21 phone call that immediately precedes in the telephone

22 traffic that date and time?

23     A.    (Pause.)  The first telephone call?

24     Q.    If you take the date and time of the deposit

25 transaction.

```
 1        A.    Oh, okay.

 2        Q.    The phone call that immediately precedes that

 3   date and time in the telephone traffic?

 4        A.    That would be 11-19-04, 10:08 a.m.

 5        Q.    And who's calling who?

 6        A.    Myself calling Aponik.

 7        Q.    Okay.  And do you know what that phone call

 8   was about?

 9        A.    No.

10        Q.    And what is the phone call that immediately

11   follows after that deposit?

12        A.    11-19-04, 11:14 a.m.

13        Q.    So what is the time difference between the

14   time of the deposit and the time of the telephone call?

15        A.    About say 20, 30 minutes.

16        Q.    And who's calling who?

17        A.    Myself calling Aponik.

18        Q.    Okay.  Do you recall what that phone call was

19   about?

20        A.    No.

21        Q.    Showing you what's marked as Exhibit 9, date

22   and time of the deposit transaction that's shown on the

23   top is 11-6-2004, according to the person from the Bank

24   of Guam it was 9:31 a.m.  Can you tell me the phone

25   call that immediately precedes in the chronology that's
```

1    shown this date and time?

2         A.    11-06-04, 9:22 a.m.

3         Q.    How long before the deposit is that phone

4    call?

5         A.    Nine minutes.

6         Q.    Okay.  And who's calling who?

7         A.    Aponik calling Canovas.

8         Q.    Okay.  Let's go to the phone call that

9    precedes that phone call; what's the phone call shown

10   just before that?

11        A.    11-5-05, 6:33 p.m.

12        Q.    And who's calling who?

13        A.    Aponik calling Canovas.

14        Q.    So for the two phone calls preceding that

15   deposit, one being the night before and one being in

16   the morning, neither one of those involves you; is that

17   correct?

18        A.    That's correct.

19        Q.    So do you have any knowledge about what those

20   phone calls were about?

21        A.    No, I don't.

22        Q.    Okay.  What's the next phone call following

23   that deposit?

24        A.    11-6-05, 12:25 p.m.

25        Q.    And who's calling who?

1     A.    Canovas calling Elm, Brian Elm, me.

2     Q.    Do you recall receiving that phone call?

3     A.    No.

4     Q.    Okay.  Do you recall what that phone call

5 might have been about?

6     A.    No.

7     Q.    Showing you what's marked as Exhibit 10, the

8 date of the transaction shown on the exhibit is

9 11-8-2004, the time of those deposits from the

10 testimony of the Bank of Guam representative was 12:58

11 p.m.  Can you tell me in the telephone traffic which is

12 listed the telephone call which immediately precedes

13 the date and time of this deposit?

14     A.    11-8-04, 12:20 p.m.

15     Q.    Okay, and who's calling who?

16     A.    Myself calling Aponik.

17     Q.    And how long in advance of the deposit was

18 that?

19     A.    About 20 minutes, 20, 30 minutes.

20     Q.    Okay.  And do you recall what that telephone

21 call may have been about?

22     A.    No.

23     Q.    What's the phone call immediately after the

24 deposit?

25     A.    11-8-04, 1:08 p.m.

1    Q.    And who's calling who?

2    A.    Aponik calling Elm.

3    Q.    Okay.  And do you recall what that telephone

4  call was about?

5    A.    No.

6    Q.    Brian, what was the last grade of education

7  you completed?

8    A.    11th.

9    Q.    Where did you complete 11th grade at?

10   A.    Guam Community College.

11   Q.    And in your final semester of school, how many

12  classes did you take?

13   A.    Six.

14   Q.    And what were your grades like?

15   A.    Average.

16   Q.    Well, can you be a little more specific about

17  what you mean by average?

18   A.    A "C", "C" average.

19   Q.    The second to the last semester of high

20  school, how many classes did you take?

21   A.    About the same.

22   Q.    Okay, about six classes?

23   A.    Yes.

24   Q.    And what were your grades like for those

25  classes?

1     A.    About a "C" average.

2     Q.    Let's talk about tenth grade.  What were your

3 grades like in tenth grade?

4     A.    Probably about the same.

5     Q.    About a "C" average?

6     A.    Yes.

7     Q.    What about ninth grade?

8     A.    "B", "C" average.

9     Q.    Brian, have you ever run any businesses?

10     A.    No.

11     Q.    Have you ever worked in any kind of managerial

12 capacity?

13     A.    No.

14     Q.    Have you ever been responsible for operating

15 some business on your own, even though it's not yours?

16     A.    No.

17     Q.    How many times have you been in trouble with

18 the law?

19     A.    I'd say quite a few.

20     Q.    Is that just as an adult?

21     A.    No, when I was a minor.

22     Q.    Tell me some of the things that you've gotten

23 in trouble for.

24     A.    When I was a minor I got in trouble for theft

25 of a motor vehicle, riding a mo-ped without a driver's

```
1    license or helmet.
2         Q.   What about as an adult?
3         A.   In '95 I was arrested for possession of a
4    controlled substance.
5         Q.   What controlled substance?
6         A.   Meth.
7         Q.   And what happened?
8         A.   I was sentenced to 21 months in federal
9    prison.
10        Q.   Did you go to trial?
11        A.   No.
12        Q.   How was it that you came to be sentenced by
13   the court?
14        A.   I pled guilty.
15        Q.   Why did you plead guilty?
16        A.   Because I was guilty for the possession.
17        Q.   What about after that?
18        A.   In 2003 I was arrested for possession, and
19   unregistered firearm.
20        Q.   And what happened with that case?
21        A.   I pled guilty.
22        Q.   And why did you plead guilty?
23        A.   Because I was responsible for the possession
24   and the firearms.
25        Q.   And any other times that you've gotten in
```

1    trouble with the law besides 1995 and 2003?

2        A.    Not that I can recall.

3        Q.    Now, you are charged in this case; why haven't

4    you pleaded guilty?

5        A.    Because I'm not involved.

6        Q.    What do you mean by you're not involved?

7        A.    I just -- I didn't have anything to do with

8    this.

9        Q.    You heard the testimony of your cousin

10   Jarrett, he says he would come to the warehouse and

11   find you smoking; is that true or not true?

12       A.    That's not true.

13       Q.    Is there anything that you think would show

14   that why, when you deny that you weren't smoking, that

15   that's true?

16       A.    I wouldn't -- I wouldn't smoke.

17       Q.    Were there certain things that were occurring

18   that you were required to do that you think show that

19   you weren't using ice?

20       A.    Yes.

21       Q.    What is that?

22       A.    Taking random urine, urinalysis tests,

23   testing.

24       Q.    Ms. Johnson points out that starting in about

25   September of 2004, that the tests were somewhat about

1   two weeks apart.  Were you aware of that at that time?

2        A.   No.

3        Q.   Were you able to anticipate when you would be

4   called in?

5        A.   No.

6        Q.   So, did you think you could use ice and get

7   away with it?

8        A.   No.

9        Q.   You've testified about owning two different

10  motorcycles.  How many motorcycles in all have you

11  owned over the last several years?

12       A.   Three.

13       Q.   What was the other one that you owned?

14       A.   A 19 -- or a 2001 Yamaha YZFR1.

15       Q.   And where did you get that one from?

16       A.   John Dudkiewicz.

17       Q.   Did you register in your name the ownership of

18  the white 4Runner?

19       A.   No.

20       Q.   Why do you think Eric Aponik has said the

21  things that he has said about you in this case?

22       A.   I really don't know.

23       Q.   Did you call your sister Verlyn?

24       A.   Yes.

25       Q.   How many times did you call your sister Verlyn

1     while you were confined?

2          A.     About less -- less than 10 times.

3          Q.     And when you called her, what did you talk to

4     her about?

5          A.     About the kids and I asked her how she's

6     doing, and stuff like that.

7          Q.     Now, you heard your sister testify that during

8     the last telephone call you made to her, you asked if

9     Eric was really going to follow through with what it is

10    that he was going to testify about; do you recall her

11    testimony about that?

12         A.     Yes.

13         Q.     Why did you -- first of all, did you actually

14    ask her that?

15         A.     Yes, I think so.

16         Q.     Why did you do that?

17         A.     I just wanted to know if he was really going

18    to go through with it, and you know, how he could do

19    that to me.

20         Q.     When you say how he could do that to you, what

21    do you mean?

22         A.     I mean in the earlier calls I would ask him,

23    you know, why he had said the things he said, and he

24    just said, oh, he didn't say it.

25         Q.     So he told you he didn't say what, what led to

1    the charges against you in this case?

2        A.    No.

3        Q.    Are you -- are you disappointed by the fact

4    that Eric has said these things about you?

5              MS. JOHNSON:  Objection; leading question.

6              THE COURT:  Overruled.

7              (Pause while defendant composed himself.)

8    BY MR. VAN DE VELD:

9        Q.    How do you feel about Eric having said these

10   things about you?

11       A.    It really hurts to think that he can do that,

12   say these stuff that aren't true about me.

13       Q.    And how do you feel about what Jarrett has

14   said about you?

15       A.    It hurts.

16       Q.    Why?

17       A.    My own cousin, to lie about me.

18       Q.    Brian, people say that you're a mastermind of

19   criminal activity; what would you say is the truth of

20   those allegations?

21       A.    I'd say it's not true.

22       Q.    Why do you say that?

23       A.    Because I'm changed, I just -- I just want to

24   get past, through this so I can be with my family.

25       Q.    In the previous two times that you've been

1    arrested and you had ice on you, were you dealing ice

2    at those times?

3        A.    No.

4        Q.    Have you ever dealt ice in the past?

5        A.    Yes.

6        Q.    How long ago?

7        A.    11 years ago.

8        Q.    And when you were dealing ice 11 years ago,

9    where did you get the ice from?

10       A.    From Duane Calvo.

11       Q.    Was that from Guam or from some place outside

12   of Guam?

13       A.    From Guam, in Guam.

14       Q.    During the period of time that you were living

15   with Keomi at the end of 2004, and you were assisting

16   her with paying the bills, how would you describe your

17   finances, your financial condition at that time?

18       A.    It was -- it wasn't bad, it was okay.

19       Q.    Did you have a lot of money?

20       A.    No.

21       Q.    Did you own a lot of toys?

22       A.    No.

23       Q.    When you took the rims off of Keomi's car and

24   put the new ones on that you gave her as a gift, did it

25   cost you anything to take those rims then and put them

1    on the white 4Runner when you bought it?

2        A.    No.

3        Q.    The used ones?

4        A.    No.

5        Q.    Why?

6        A.    It was just like a swap off, even swap off.

7        Q.    Okay, so when you put the brand new ones on

8    that you gave her as a gift, those cost you money, is

9    that right?

10        A.    Yes.

11        Q.    But the ones that you took off of there, she

12    already owned them; is that right?

13        A.    Yes.

14        Q.    And then when you transferred them on to the

15    white 4Runner, did you do that work yourself?

16        A.    I remember Eric had helped me in doing that.

17        Q.    Okay.  So it didn't cost you any money?

18        A.    No.

19        Q.    Have you ever made any kind of a wire transfer

20    to anyone in your lifetime?

21        A.    No.

22        Q.    Have you ever been to a Western Union

23    facility?

24        A.    No.

25        Q.    Do you know how you make a wire transfer?

1    A.   No.

2    Q.   Now, do you know how long Eric has run his

3  parents' business?

4    A.   I'm not sure.

5    Q.   Well, how long have you known him that he's

6  been running the business?

7    A.   I'd say within the last two, three years.

8  Three years.

9         MR. VAN DE VELD:  I have nothing further.

10        THE COURT:  All right.  Cross-examination.

11        MS. JOHNSON:  Yes, Your Honor.

12        If I may approach the witness?

13        THE COURT:  Very well.

14        MS. JOHNSON:  These have been marked Exhibits

15  31, 32, and 33.

16                **CROSS-EXAMINATION**

17  BY MS. JOHNSON:

18    Q.   Mr. Elm, can you take a look at Exhibits 31 --

19  Exhibit 31; is that your true name on that document?

20    A.   Yes.

21    Q.   Yes?  Is that you?

22    A.   Yes.

23    Q.   Exhibit 32, is that your name?

24    A.   Yes.

25    Q.   Is that you?

1     A.    Yes.

2     Q.    And Exhibit 33, is that your name?

3     A.    Yes.

4     Q.    Is that you, are you the subject of that?

5     A.    Yes.

6           MS. JOHNSON:  I'd offer 31, 32, and 33.

7           MR. VAN DE VELD:  Without objection, Your

8    Honor.

9           THE COURT:  They'll be admitted.

10   BY MS. JOHNSON:

11    Q.    Mr. Elm, you've just told this jury under oath

12   that when you were found in possession of ice, or meth

13   as you call it, in 1995, you pled guilty to possession

14   and did 21 months in a federal penitentiary; is that

15   true?

16    A.    I pled guilty to distribution.

17    Q.    In fact, you did plead guilty to distribution,

18   didn't you?

19    A.    Yes.

20    Q.    You told this jury that you got that ice from

21   Duane Calvo; is that right?

22    A.    Yes.

23          MS. JOHNSON:  Let me mark this as Exhibit 34,

24   for reference purposes.

25    Q.    Do you remember the plea agreement you entered

1    into when you pled guilty to distribution?

2         A.    I don't remember it.

3              MS. JOHNSON:  May I approach the witness, Your

4    Honor?

5              THE COURT:  Yes.

6              MR. VAN DE VELD:  May I see the document

7    first, Your Honor?

8                   (Government counsel gives document to

9                   defense counsel to review.)

10   BY MS. JOHNSON:

11        Q.    I want to call your attention to Page 4, ask

12   you to review this.

13        A.    (Pause to review document.)

14        Q.    Does that refresh your recollection about the

15   plea agreement you entered into when you pled guilty to

16   distribution?

17        A.    Yes.

18        Q.    In fact, you said you'd gotten that ice from

19   Mai Lien Lee, didn't you?

20        A.    Yes.

21        Q.    Not from Duane Calvo.

22        A.    My mistake.

23        Q.    Were you also dealing ice you got from Duane

24   Calvo?

25        A.    Yes.

1    Q.   So you had more than one source of ice?

2    A.   Yes.

3    Q.   When you look at Exhibit 31, is that the

4    conviction that you got in the Superior Court?

5    A.   Yes.

6    Q.   And you were arrested on that charge on

7    September 16 of '03, weren't you?

8    A.   Yes.

9    Q.   And at the time you were down in Tumon by the

10   church, isn't that true?

11   A.   Yes.

12   Q.   And remember when you talked to the officer,

13   you told him that you were going home?

14   A.   Yes.

15   Q.   But you lived in Barrigada, right?

16   A.   Yes.

17   Q.   Do you remember him asking why you were in

18   Tumon if you lived in Barrigada?

19   A.   Yes.

20   Q.   And what did you tell him?

21   A.   I said I was looking for my wallet I had lost.

22   Q.   You were looking for?

23   A.   My wallet.

24   Q.   And what time was it in the morning?

25   A.   About three.

```
1      Q.    3:00 a.m. in the morning?

2      A.    Yes.

3      Q.    And you were in Tumon looking for your wife?

4      A.    Yes.

5      Q.    Why did you say she was --

6      A.    Wallet.

7      Q.    Excuse me?

8            THE COURT:  Wallet.

9            MS. JOHNSON:  Wallet, I'm sorry.

10     Q.    The backpack you had with you, he discovered a

11     loaded 9-millimeter pistol in it, didn't he?

12     A.    Yes.

13     Q.    You remember telling him that it wasn't your

14     backpack, that you'd just found it?

15     A.    Yes.

16     Q.    And you didn't know anything about the gun or

17     the ice in there?

18     A.    Yes.

19     Q.    That was a lie, wasn't it?

20     A.    Yes.

21     Q.    And you were lying to try to get out of a

22     criminal charge, weren't you?

23     A.    (Pause.)  Can you rephrase the question?

24     Q.    You were lying to the police officer in the

25     hopes of avoiding a criminal charge, weren't you?
```

1     A.   No.

2     Q.   Why did you lie to him?

3     A.   I -- I don't know.

4     Q.   Excuse me?

5     A.   I don't know.

6     Q.   Exhibit 33, you've also been convicted of a

7 firearms conviction in this court, Federal Court, in

8 2005, isn't that true?

9     A.   Yes.

10     MR. VAN DE VELD:  Objection; it misstates the

11 record.  She said 2005, and she at the beginning said

12 2003.

13     A.   2003.

14     MS. JOHNSON:  I'm talking about the date the

15 judgment was entered.

16     Q.   So as it stands right now, you have three

17 prior felony convictions, isn't that true?

18     A.   Yes.

19     Q.   And you are very frightened, aren't you,

20 Mr. Elm?

21     A.   Yes.

22     Q.   Because you're looking at 20 years in a

23 federal penitentiary, aren't you?

24     A.   Yes.

25     Q.   These motorcycles, is it true that you had a

1    2000, year 2000 Yamaha that you registered in September

2    of 2003?

3         A.    Yes.

4         Q.    Did counsel show you the Motor Vehicle

5    Division check?

6         A.    No.

7         Q.    You also had a 1997 Suzuki that you registered

8    in November 17 of 2004, didn't you?

9         A.    Yes.

10        Q.    And you also had a 2001 Yamaha that you

11   registered in December 16 of 2004?

12        A.    Yes.

13        Q.    So, in November and December you had two

14   motorcycles?

15        A.    No.

16        Q.    You acquired one and bought the other?

17        A.    Yes.

18        Q.    Where did you get the money to buy the one in

19   November of 2004?

20        A.    Which one was that?

21        Q.    That was the 1997 Suzuki, according to the

22   MVD printout, it was orange?

23        A.    Yes, I had sold my 2001 Yamaha, the R6, the

24   first one I bought.

25        Q.    And a month later you bought your third

1    motorcycle, the 2001 Yamaha that was red and white?

2        A.    Yes.

3        Q.    How much did you pay for that?

4        A.    7500.

5        Q.    In 2003, you earned about $8,829, didn't you?

6        A.    I'm not sure.

7        Q.    Do you remember being interviewed by the

8    federal presentence people?

9        A.    Yes.

10       Q.    And did you tell them that you earned about

11   $8,829?

12       A.    Yes, I think so.

13       Q.    And in 2004 Agent Griffith has already

14   testified your W2 form shows 4981.60, almost 5,000; is

15   that all you earned in 2004?

16       A.    Uh, I don't think so.

17       Q.    How much more did you earn?

18       A.    I'm not sure.

19       Q.    You weren't paying taxes on it, were you?

20       A.    I wasn't sure.

21             MS. JOHNSON:  You talked about buying a sound

22   system for this white Toyota 4Runner.

23             May I approach the witness?

24             (Handing a document to the witness.)

25       Q.    And can you review that list of auto sound

1    parts that's in front of you?

2        A.    Okay.

3        Q.    Does that refresh your recollection as to what

4    you actually bought and what you paid for it?

5        A.    Yes.

6        Q.    And in fact you bought $1800 worth of sound

7    stereo equipment for that vehicle, didn't you?

8        A.    Yes.

9        Q.    In 2003 -- let me go back a little bit.  You

10    said you know Chris Iager; is that right?

11        A.    Yes.

12        Q.    You've known him many years?

13        A.    Yes.

14        Q.    Where is he now?

15        A.    I don't know.

16        Q.    When did he leave Guam?

17        A.    I don't know.

18        Q.    You haven't seen him for over a year, have

19    you?

20        A.    No.

21        Q.    In fact, he left before you went into jail in

22    March of '05, didn't he?

23        A.    I wouldn't know that.

24        Q.    In 2003 and early 2004, isn't it true that

25    Chris Iager was selling ice?

```
 1        A.    I don't know.

 2        Q.    You did not know that Mr. Mendiola was sending

 3   ice to Chris Iager among other people?

 4        A.    No.

 5        Q.    To be sold on Guam?

 6        A.    No.

 7        Q.    Mr. Aponik, I'm sure you've heard his

 8   testimony, that he drove you over to Iager's house

 9   where you picked up some ice, and then you two went

10   and smoked it; is that true or not?

11        A.    That's not true.

12        Q.    Did you ever get any ice from Iager?

13        A.    No.

14        Q.    Well, where were you getting 7our ice in 2003?

15              MR. VAN DE VELD:  Objection; assumes facts not

16   evidence.

17   BY MS. JOHNSON:

18        Q.    You had a cut straw on your person when you

19   were arrested?

20        A.    2003?

21        Q.    Yeah, 2003, when you were arrested, where did

22   that ice come from?

23        A.    From friends.

24        Q.    What friend?

25        A.    Uh, I don't remember.
```

1     Q.    You don't remember?

2     A.    No.

3     THE COURT:  Let's take the noon recess.  We'll

4 start up again at 1:00 o'clock.

5            (Luncheon recess taken at 12:01 p.m.)

6            (Proceedings resumed at 1:05 p.m.)

7            (All parties and jurors present.)

8     THE COURT:  Please be seated.

9     All right, Ms. Johnson.

10     MS. JOHNSON:  Thank you, Your Honor.

11     Q.    Mr. Elm, in October of 2004 or thereabouts,

12 Keomi Lujan had a post office box, didn't she?

13     A.    Yes.

14     Q.    And that was at Guam main facility, is that

15 right?

16     A.    Yes.

17     Q.    Do you have a key to it?

18     A.    No.

19     Q.    Why not?

20     A.    She's the one picking up the mail.

21     Q.    So, the post office records would only show

22 that one key had been issued?

23     A.    Yes.

24     Q.    And where did she keep that key?

25     A.    On the keys for the vehicle.

1     Q.    Keys for the what?

2     A.    For her -- for her car.

3     Q.    Now, the drug testing counsel's asked you

4 about, in fact you had a system to beat it, didn't you?

5     A.    No.

6     Q.    When you call early in the morning and be

7 advised that you'd be tested, isn't it true that you

8 drank quarts of water, flushed out your system, and

9 then go in and test clean?

10    A.    No.

11    Q.    You never bragged about that?

12    A.    No.

13    Q.    Did you ever call Mr. Aponik and tell him not

14 to testify against Mr. Espinosa?

15    A.    No, I don't remember that.

16    Q.    You heard the testimony of your cousin,

17 Jarrett Elm, that he came into the Aponik warehouse one

18 day to get a drink from the refrigerator, and there was

19 a table there, and he saw you and Mr. Aponik seated at

20 the table with a scale, digital scale between you, and

21 a packet of ice between you; is that true?

22    A.    No.

23    Q.    Do you know -- what is your relationship with

24 Jarrett Elm?

25    A.    He's my cousin.

1      Q.    And he's about 10 years younger than you,

2  right?

3      A.    Yes.

4      Q.    Are you on good terms?

5      A.    Uhm, yeah.

6      Q.    You've never had a dispute or a falling out?

7      A.    Actually, I would -- would ask him -- uh, no.

8      Q.    No bad blood between you?

9      A.    No.

10      Q.    So, do you know why he would say this about

11  you if it wasn't true?

12      A.    I wouldn't know why.

13      Q.    This white 4Runner you had, you never

14  registered it in your own name, did you?

15      A.    No.

16      Q.    Why not?

17      A.    I'm -- I'm not sure why.

18      Q.    Chris Iager, you've denied that you were

19  dealing ice for him during 2003 and 2004; is that

20  correct?

21      A.    Yes.

22      Q.    Did you ever brag to Mr. Aponik that you were

23  moving 10 to 20 grams a week for Mr. Iager?

24      A.    No.

25      Q.    You know Albert Mendiola, however, right?

1    A.   Yes.

2    Q.   You knew he was in Las Vegas?

3    A.   No, I didn't know he's in Las Vegas.

4    Q.   So you didn't even know where he was?

5    A.   No.

6    Q.   What is Mr. Iager's phone number?

7    A.   I can't remember.

8    Q.   Did he have a cell phone?

9    A.   I believe so.

10   Q.   Excuse me?

11   A.   Yes.

12   Q.   Okay.  And is it true that when you were

13   helping Mr. Aponik renovate his warehouse, that

14   Mr. Iager would come over there and the three of you

15   would smoke ice together?

16   A.   That wasn't true.

17   Q.   And is it not true that you gave Jarrett Elm

18   ice and shared it with him?

19   A.   No.

20   Q.   Exhibit 7 is an analysis of your phone

21   records, calls in, calls out.  Out of curiosity, whose

22   phone is 472-5828?

23   A.   That would be my sister's.

24   Q.   Which sister?

25   A.   Verlyn Aponik.

```
 1      Q.    Who?

 2      A.    Verlyn Aponik.

 3      Q.    Mr. Aponik's wife?

 4      A.    Yes.

 5      Q.    Okay.  Who belongs to 828-1041?

 6      A.    That would be my cousin Katrina, where she

 7    works, that's her store in Merizo.

 8      Q.    How about 678-4038?

 9      A.    I -- I don't know.

10      Q.    How about 637-2117?

11      A.    That's my uncle Allan Elm's number.

12      Q.    How about 678-4038?

13      A.    I don't remember that number.

14      Q.    How about 689-9774?

15      A.    I don't remember that number.

16      Q.    How about 787-6461?

17      A.    I don't remember that number.

18      Q.    688-2038?

19      A.    I don't remember that number.

20      Q.    How about 472-5824?

21      A.    I don't know.

22      Q.    And yet you say you were calling all these

23    people, friends and relatives just to chat with them?

24      A.    Yes.

25      Q.    If we go through these records, how many times
```

1   will we find calls to Chris Iager during this five-

2   month period?

3      A.   I wouldn't know.

4      Q.   Will we find any calls to Mr. Iager from you?

5      A.   I don't know.

6      Q.   You can't remember calling him at all?

7      A.   (Pause.)  I'm not sure.

8      Q.   You're not sure if you called him?

9      A.   Yes.

10      Q.   If you had, would it be fair to say that it

11   wasn't that often, or you would remember it?

12      A.   Yes.

13      Q.   So we'd find very few calls from you to

14   Mr. Iager, if any, is that right?

15      A.   Yes.

16      Q.   The cell phone that you got October 1st; had

17   you ever had one before?

18      A.   No.

19      Q.   Why did you get one at that particular time,

20   October 1st of 2004?

21      A.   To communicate with Keomi.

22      Q.   And what had you done to communicate with her

23   all the years before that?

24      A.   I would just call her from work or from home.

25      Q.   So why the pressing need for a cell phone as

1 of that date?

2  A. No reason.

3  Q. Excuse me?

4  A. No reason.

5  Q. There's no reason.  And did you ask her to get

6 the cell phone for you?

7  A. Yes.

8  Q. And you ran up hundreds of dollars worth of

9 bills on it because were you bored; is that your

10 testimony?

11  A. Yes.

12  Q. How could you afford that kind of bills for

13 this cell phone?

14  A. The bills came out, I believe, in every month.

15  Q. Uh-huh.

16  A. And I would pay for it.

17  Q. So from the testimony that you and Ms. Lujan

18 have given, you are certainly not wealthy people?

19  A. Right.

20  Q. In fact, you appear to be watching every penny

21 that you spend, right?

22  A. On and off, yes.

23  Q. You were frugal, is that correct?

24  A. Yes.

25  Q. And yet you took out a cell phone and you ran

Case 1:07-cr-00026    Document 17-2    Filed 06/08/2007    Page 57 of 72

1    up almost $900 worth of bills and you can't tell us

2    why; is that correct?

3         A.    That's over a five-month period.

4         Q.    Yes.

5         A.    Yes.

6         Q.    Over a five-month period?

7         A.    Yes.

8         Q.    You talked about Exhibit 26, those are the

9    calls to and from Mr. Canovas's phone.  Before you got

10   your cell phone, had Mr. Canovas ever called you just

11   to chat?

12        A.    I'm not sure, no.

13        Q.    Well, he was living in Las Vegas at the time,

14   wasn't he?

15        A.    Yes.

16        Q.    And wouldn't it be kind of unusual, I mean,

17   your only connection was through your cousin Derek; is

18   that right?

19        A.    Yes.

20        Q.    And so wouldn't it be unusual for him to call

21   you and run up a bill just chatting with you?

22        A.    Yes.

23        Q.    It'd be more likely he'll call Derek, right,

24   if he was going to call anybody?

25        A.    But my cousin Derek wasn't on island, so --

1      Q.   Okay.  So there's no reason for him to call

2  Guam at all, would that be correct?

3      A.   Yes.

4      Q.   And do you recall the barbecue when he was

5  home for the summer after summer school had let out?

6      A.   I -- vaguely.  I don't recall.

7      Q.   You don't recall that barbecue?

8      A.   No.

9      Q.   And did you ever ask him to send you ice so

10 that you could begin distributing it yourself?

11     A.   No.

12     Q.   Counsel asked you about these phone calls.

13 For example, the first one that the records show is

14 from Las Vegas, Mr. Canovas's phone, directly to you at

15 1238.  What happened during that phone call?

16     A.   I can't remember.

17     Q.   Well, you testified on direct that he was

18 looking for Eric Aponik; is that true?

19     A.   Yes.

20     Q.   So you do remember when was looking for

21 Mr. Aponik?

22     A.   Yes.

23     Q.   And that's your testimony?

24     A.   Yes.

25     Q.   He didn't call you to tell you that a package

1   of ice was on the way?

2       A.   No.

3       Q.   And what did you -- did he ask for you to

4   convey a message to Mr. Aponik?

5       A.   Certain times, yeah, he'll ask me to just let

6   him know he called or that he'll call him back, he'll

7   try and call back to see if he answers his phone or --

8       Q.   Why was he calling you at all?

9       A.   I don't know.

10      Q.   Why wouldn't he call Mr. Aponik directly?

11      A.   I don't know.

12      Q.   And leave a message?

13      A.   I don't know.

14      Q.   The next call -- we have a deposit here

15  October 13, $1,000 in the Bank of Guam, and then on

16  October 14 he's calling you again; do you remember why?

17      A.   No.

18      Q.   Was it to ask for Mr. Aponik?

19      A.   Could be, yes.

20      Q.   You don't know?

21      A.   (No response.)

22      Q.   But it was not to discuss drugs?

23      A.   Right.

24      Q.   Or proceeds?

25      A.   No.

1    Q.    On the 25th, he calls you twice; do you

2    remember what these calls were about?

3    A.    No.

4    Q.    On October 25 there was another deposit into

5    the Bank of Guam, and then for the first time in these

6    records on October 29 there's a call from Aponik's

7    phone to him.  Mr. Aponik said that you were using his

8    phone to call Las Vegas because he had long distance

9    service; is that true?

10   A.    That's not true.

11   Q.    You were not using his phone?

12   A.    No.

13   Q.    Never ever?

14   A.    No.

15   Q.    Some of these calls look as if they're return

16   calls.  For example, October 30th, Aponik's phone is

17   used to call Mr. Canovas, but when he calls back, he

18   calls you, not Mr. Aponik.  Do you know why that would

19   be?

20   A.    I don't know why.

21   Q.    Another example, November 9, Aponik's phone is

22   used to call Canovas at 1116, and 20 minutes later he's

23   calling back, but he's not calling Mr. Aponik, he's

24   calling you; why would that be?

25   A.    I -- I don't know.

1      Q.   You had no business between the two of you,

2 did you?

3      A.   No.

4      Q.   So other than drugs, what would this phone

5 call be about?

6      A.   Probably looking for Eric, or -- I don't know.

7      Q.   Why wouldn't he -- he obviously has

8 Mr. Aponik's phone number; why wouldn't he just call

9 Mr. Aponik?

10      A.   I don't know.

11      Q.   And why would he think that you would know

12 where Mr. Aponik was?

13      A.   Because we're usually together.

14      Q.   Because what?

15      A.   We're usually together.

16      Q.   So, he's not calling in response to a call

17 from you?

18      A.   No.

19      Q.   When you go through Exhibit 4, Mr. Aponik's

20 records, you never see a phone call from Las Vegas to

21 Mr. Aponik directly, not a single one; can you explain

22 that?

23      A.   Could you repeat that?

24      Q.   When you look at Exhibit 4, and you scan page

25 after page of records, you see Mr. Aponik's phone being

1  used to call Las Vegas, being used to call Mr. Canovas,

2  and we see Mr. Canovas calling you.  There is not a

3  single record of Mr. Canovas calling Mr. Aponik; do you

4  know why that is?

5      A.    I don't know why.

6      Q.    Now John Cruz said that he heard through your

7  cousin Derek that you were dealing ice and he gave you

8  a call and he purchased a gram from you at Gogue's

9  Market; is that true?

10      A.    That's not true.

11      Q.    And he said that the next time it was two

12  grams, and it was from your residence; is that true?

13      A.    That's not true.

14      Q.    He said that he was buying ice from you on an

15  almost daily basis; is that true?

16      A.    No.

17      Q.    Now, Mr. Cruz is not a friend of yours, is he?

18      A.    Yes.

19      Q.    Well, he's not a very close friend, is he?

20      A.    No.

21      Q.    I mean, you see him when you go down to Merizo

22  for barbecues; right?

23      A.    Yes.

24      Q.    And that's about it, right?

25      A.    Yes.

1      Q.    Is there any bad blood between you?

2      A.    No.

3      Q.    Do you know why he would say this about you if

4   it wasn't true?

5      A.    I wouldn't know why.

6      Q.    Now, counsel had asked you about the phone

7   calls that Mr. Cruz was making, and you said that each

8   time Mr. Cruz was calling you to ask where Eric was; is

9   that right?

10     A.    Yes.

11     Q.    Okay.  So when we look at Exhibit 28, for

12  example, we see on November 6 he called you at 2:13

13  2:47, and 7:31 in the evening.  Are all three of these

14  calls to ask where Mr. Aponik is?

15     A.    Sometimes my brother B.J. would use his phone

16  to call me, since they both stay in Merizo.  So most of

17  those, some of those calls are from my brother, B.J.

18  Elm.

19     Q.    Why would he be calling on Mr. Cruz's phone?

20     A.    They hang out together.

21     Q.    Didn't B.J. have his own telephone?

22     A.    No.

23     Q.    Who was he living with?

24     A.    Uh, with his girlfriend.

25     Q.    He didn't have a telephone?

1  A.  I wouldn't know that.

2  Q.  What?

3  A.  I don't know.

4  Q.  So now you're saying that these calls from

5  Cruz to you were not necessarily to look for

6  Mr. Aponik, but they were from your brother?

7  A.  Yes.

8  Q.  How many of them are from your brother?

9  A.  I don't know.

10  Q.  What was your brother talking about?

11  A.  Just checking what I'm doing.

12  Q.  Why would your brother be calling within half

13  an hour of the previous call?

14  A.  I don't know.

15  Q.  We see many times in this record, for example,

16  on January 21st of '05 you were calling Mr. Cruz.  Why

17  were you doing that?

18  A.  Probably to ask if my brother was with him.

19  Q.  Probably?

20  A.  Yes.

21  Q.  You can't remember?

22  A.  No.

23  Q.  And you didn't know your brother's

24  girlfriend's telephone number?

25  A.  No.

1     Q.   And we see what appears to be return calls;

2  for example, on February 12, Mr. Cruz calls you at

3  12:24, and within the hour you're returning his call.

4  Why?

5     A.   I don't know.

6     Q.   Why would you be calling Mr. Cruz if it were

7  not concerning drugs?

8     A.   Probably for my brother.

9     Q.   So in effect you're saying that all of these

10  are calls to or from your brother on Mr. Cruz's

11  telephone; is that right?

12     A.   Yes.

13     Q.   Why would Mr. Cruz let him use his telephone

14  and run up a bill on his phone?

15     A.   I don't know.

16     Q.   Now Mr. Aponik has said that shortly before

17  you went to jail that you introduced him to Mr. Cruz

18  and put them together so that they could continue this

19  drug operation; is that true?

20     A.   That's not true.

21     Q.   And yet the very first call that we see from

22  either Aponik to Cruz or Cruz to Aponik does not occur

23  until March 15, three days before you go into jail.

24  Can you explain that?

25     A.   I can't.

1       Q.    What?

2       A.    I can't.

3       Q.    No.  Is there any bad blood between you and

4  Mr. Canovas?

5       A.    Not that I -- no.

6       Q.    Do you know why he'd be saying this about you

7  if it weren't true?

8       A.    I wouldn't know why.

9             MS. JOHNSON:  Thank you.  I have nothing

10  further.

11            THE COURT:  Redirect.

12            MR. VAN DE VELD:  Let the record reflect that

13  I'm showing the witness Exhibit No. 4 and directing his

14  attention to page 39 center of the page.

15                    **REDIRECT EXAMINATION**

16  BY MR. VAN DE VELD:

17      Q.    Ms. Johnson said that there were no phone

18  calls from Eric Aponik's phone to Mr. Canovas.  Can you

19  tell me what the date is that it shows in Exhibit 4?

20            MS. JOHNSON:  Objection.  Misstates the

21  question, it was Canovas to Aponik.

22            THE COURT:  Rephrase the question.

23  BY MR. VAN DE VELD:

24      Q.    Can you please take a look at Exhibit No. 4

25  and tell me what it is that you find in the center of

1      the page?

2          A.    Says here Las Vegas.

3          Q.    Okay.  And what number is calling, is placing

4      the call according to these charts?

5          A.    777-6211.

6          Q.    Okay.  And what number is being called?

7          A.    702-491-9712.

8          Q.    You have the cell phone records of John V.

9      Cruz?

10         A.    No.

11         Q.    Do you have the cell phone records of Jonathan

12     Canovas's prepaid phones?

13         A.    No.

14         Q.    So, would it be accurate to say that you don't

15     know whether or not there were phone calls from those

16     people to Mr. Aponik?

17         A.    Yes.

18         Q.    Showing you what's marked as Government's

19     Exhibit 31.  You indicate that back in 1995 that you

20     had been charged with possession; do you recall that

21     part of your testimony?

22         A.    Yes.

23         Q.    Okay.  And at a further part in your testimony

24     you indicated that 11 years ago you were distributing

25     ice; is that correct?

1     A.    (Nodding.)

2     Q.    Okay.  If you look at Exhibit 30 -- was it 32

3 I gave you?  I'm sorry.

4     A.    31.

5     Q.    31.  Do you know whether or not the charge

6 that you actually pled guilty to was possession with

7 intent to distribute?

8     A.    No.

9     Q.    Okay.  What was the charge that you actually

10 pled guilty to?

11     A.    Distribution of methamphetamine.

12     Q.    Okay.  And that was how many years ago?

13     A.    11.

14     Q.    Do you know how Eric Aponik received mail

15 before he got his post office box in November of 2004?

16     A.    I think it was his dad's mailbox.  I'm not

17 sure.

18     Q.    And he also at that time was working at

19 Reaction Company; is that correct?

20     A.    That's correct.

21     Q.    (Pause.)  When you called your sister Verlyn

22 at 472-5828, were you calling her to talk to her about

23 drugs?

24     A.    No.

25     Q.    When you called your cousin Katrina at

1   828-1061, were you calling her to talk to her about

2   drugs?

3       A.   No.

4       Q.   When you called 637-2117 to talk to your Uncle

5   Allan, were you talking to him about drugs?

6       A.   No.

7       Q.   So there's lots of phone calls that you've

8   made, isn't that correct?

9       A.   Yes.

10      Q.   And were any of them about drugs?

11      A.   No.

12           MR. VAN DE VELD:  Nothing further.

13           THE COURT:  Recross.

14           MS. JOHNSON:  Nothing further, Your Honor.

15           THE COURT:  All right.  You may step down.

16           MR. VAN DE VELD:  Your Honor, I have the 2005

17  Guam Island Telephone Directory I would like the court

18  to take judicial notice of.

19           THE COURT:  Any objection?

20           MS. JOHNSON:  For what purpose?

21           MR. VAN DE VELD:  The purpose is to show the

22  address of J. C. Marketing, which is the business owned

23  and operated by Mr. Canovas's parents.

24           MS. JOHNSON:  Can we not stipulate to that?

25           THE COURT:  Why don't you see it, counsel, and

1    you can agree upon the address.

2           (Pause while counsel conferred.)

3           MS. JOHNSON: No objection, Your Honor, we'll

4    stipulate that J. C. Marketing was at the City Air

5    Plaza, 1700 Route 16 in Dededo.

6           THE COURT: All right.

7           MR. VAN DE VELD: Your Honor, I'd further like

8    the court to take judicial notice that under the

9    sentencing guidelines that if a person is found to be a

10    manager, leader, or organizer of a drug activity, that

11    there is a corresponding increase in the offense level

12    which affects the sentence recommendation that's made

13    to the court by the sentencing guidelines, by

14    increasing that sentencing recommendation.

15           THE COURT: Any objection to that?

16           MS. JOHNSON: No.

17           THE COURT: All right.

18           MR. VAN DE VELD: Further, that under those

19    same sentencing guidelines that if you are found to be

20    an organizer, leader, or manager of an activity

21    involving drugs, you are not able to get the two-level

22    reduction for the safety valve which also is a basis

23    for allowing a departure -- excuse me -- the court to

24    not impose a sentence under the mandatory minimums of a

25    statute under Section 3553(e) of Title 18 of the United

1    States Code.

2              MS. JOHNSON:  No objection.

3              THE COURT:  All right.

4              MR. VAN DE VELD:  At this point in time, Your

5    Honor, defense rests.

6              (End of requested transcript.)

7                        *   *   *

8

9

10                  CERTIFICATE OF REPORTER

11

12   CITY OF AGANA       )
                         ) ss.
13   TERRITORY OF GUAM   )

14

15         I, Wanda M. Miles, Official Court Reporter

16   of the District Court of Guam, do hereby certify the

17   foregoing pages 1-71, inclusive, to be a true and

18   correct transcript (excerpt) of the shorthand notes

19   taken by me of the within-entitled proceedings, at the

20   date and time therein set forth.

21              Dated this 24th day of October, 2006.

22

23              Wanda M. Miles

24

25