1     IN THE DISTRICT COURT OF GUAM

2      TERRITORY OF GUAM

3        * * *

**FILED**

DISTRICT COURT OF GUAM

OCT 11 2006

MARY L.M. MORAN
CLERK OF COURT

9 UNITED STATES OF AMERICA, ) **COURT OF APPEALS**
           )  **CASE NO. 06-**
10     Plaintiff,  )
           )
11   vs.      )CRIMINAL CASE
           )  NO. CR05-00053
12 BRIAN WILLIAM ELM,   )
           )
13     Defendant.  )
 —————————————————————)

16

17     TRANSCRIPT OF PROCEEDINGS

        BEFORE

   THE HONORABLE JOHN C. COUGHENOUR

     Designated District Judge

     **SENTENCING HEARING**

    **TUESDAY, OCTOBER 10, 2006**

US Attorney's Office
Districts of Guam & NMI

OCT 11 2006

Time 414

**GOVERNMENT
EXHIBIT
3**

     Wanda M. Miles
    Official Court Reporter
    District Court of Guam

**APPEARANCES:**

FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                      BY:  KARON V. JOHNSON, Esq.
                      ASSISTANT UNITED STATES ATTORNEY
                      Suite 500, Sirena Plaza
                      108 Hernan Cortez Avenue
                      Hagatna, Guam  96910

FOR THE DEFENDANT:    LAW OFFICES OF VAN DE VELD,
                           SHIMIZU, CANTO & FISHER
                      BY:  CURTIS C. VAN DE VELD, Esq.
                      167 East Marine Corps Drive
                      Hagatna, Guam  96910

HAGATNA, GUAM; TUESDAY, OCTOBER 10, 2006; 11:05 A.M.

* * *

THE CLERK:  Case number CR05-53, United States of America versus Brian William Elm.

Counsel, make your appearances.

MS. JOHNSON:  Good morning, Your Honor, Karon Johnson for the United States, with Paul Griffith of DEA.

THE COURT:  Ms. Johnson.

MR. VAN DE VELD:  Good morning, Your Honor, Curtis Van de Veld on behalf of the defendant, Brian Elm, who's to my immediate right.

THE COURT:  Mr. Van de Veld.

Mr. Elm, have you had an opportunity to review and comment on the presentence report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Mr. Van de Veld, do you wish to be heard?

MR. VAN DE VELD:  Yes, Your Honor.  Your Honor, do you want me to give all my comments both as to what the ultimate sentence should be as well as my position on the PSR, all at one time?

THE COURT:  Sure.

MR. VAN DE VELD:  Okay.  Thank you for coming back for the sentencing.  It's important to Mr. Elm

1  that you be here to decide some of these issues because

2  the presentence report recites essentially all of the

3  facts that essentially were a part of the basis of the

4  charges that were presented to the jury. And only

5  because of the fact that you sat through the trial are

6  you in the position to be able to understand why it is

7  that the jury's verdicts don't support the offense

8  conduct as included in the presentence report.

9        THE COURT: Now, in that regard, let me ask

10  you the question. In your sentencing memorandum you

11  make reference to the three ranges in the verdict, the

12  jury having seized upon the middle range.

13        MR. VAN DE VELD: Yes, Your Honor.

14        THE COURT: Which was, as I understand it, 10

15  to 50 grams; not less than 10, nor more than 50.

16        MR. VAN DE VELD: I recall it as being five,

17  more than five -- more than five grams -- five grams or

18  more, but less than 50.

19        THE COURT: Less than 15?

20        MR. VAN DE VELD: 50.

21        THE COURT: Is it five to 50?

22        MS. JOHNSON: Five-zero.

23        THE COURT: Okay, I understand that. And you

24  say that the court should assume that it was five grams

25  at least, which would give a base offense level of 26.

If the court assumed that it was 50 grams, what would that do to the base offense level?

MR. VAN DE VELD: I believe it raises it up to level 30.

(Pause.)

Yes, it would be level 30.

THE COURT: All right. Go ahead.

MR. VAN DE VELD: The government's position paper with regard to sentencing suggests that all of the conduct that was alleged against the defendant is true. It thereby says that you should give a two-level enhancement to the guidelines as Mr. Elm having been an organizer of the group and the leader of the activity.

That would be completely inconsistent with the jury's verdicts in this case, there being 12 verdicts for which he was completely acquitted. Those, the evidence in reliance upon those verdicts was the testimony of Eric Aponik, John V. Cruz, Jonathan Canovas, and that testimony related that Mr. Elm was the person who was responsible for leading the activity. That was the basis of him being the person responsible for the money laundering charges.

The testimony was that Mr. Cruz would sell the drugs, Mr. John V. Cruz would sell the drugs, return the money to Brian, and Brian would give the money to

1    Eric Aponik, and Eric Aponik would then take the money

2    and wire it to Jonathan Canovas based upon the

3    arrangements between all of them.

4           The jury didn't accept that testimony as true.

5    And because it didn't accept that testimony as true,

6    and it -- it returned a verdict of not guilty as to

7    those charges, it would be completely inconsistent with

8    giving honor and respect to the jury's verdicts to then

9    turn around after the verdicts had been rendered and

10    assume those facts to be true for purposes of

11    sentencing.

12           So I ask the court to not accept the offense

13    conduct as it was previously described prior to trial,

14    and as it was included in the offense conduct in the

15    presentence report, because to do so will ignore the

16    fact that the jury not only spent a week listening to

17    the evidence, but sat for another week deliberating on

18    the evidence before reaching a verdict.

19           I'm sure that the court understands they

20    spent -- well, in Guam, a week of deliberation is a

21    rather long period of time.  It may not be a long

22    period of time for deliberations in the state of

23    Washington, but here, most deliberations usually take

24    a day.  Anything longer than that is usually fairly

25    long.  And I think that in this particular case,

1  deliberations were long and reflects the fact that the

2  jury approached this in a very deliberative manner.

3  I've tried to be in a position to counsel

4  my client on his ability to obtain acceptance of

5  responsibility.  The presentence report suggested

6  he should not receive a credit for acceptance of

7  responsibility.  I urge the court not to consider

8  giving him the -- I ask the court to give him the

9  acceptance of responsibility and not consider the

10 position that he didn't accept responsibility as

11 contained within the presentence report, because he

12 asked me to provide for him an idea of what it was was

13 the basis for the jury returning its verdict of guilty

14 in the middle range of the three quantity levels in the

15 special interrogatory included in the verdict.  I'd

16 like to think of myself to be a fairly intelligent

17 person, and I really tried to consider the evidence in

18 this case as to how it is they may have reached that

19 verdict, and I could only come up with two particular

20 pieces of evidence that I thought might have supported

21 the verdict.

22 One was the testimony of Jarrett Elm which

23 talked about him having arrived at the warehouse in

24 August of 2004 and had seen Eric Aponik and Brian

25 sitting at a table, and that some ice was on the table

1   in a baggie--he didn't know how much--and they were

2   dividing it up, according to Jarrett, for sale.  The

3   other would have been the testimony of Brian himself

4   when he was on the witness stand and talking about when

5   he had been arrested previously and he had -- there had

6   been a gun in his backpack as well as some amount of

7   methamphetamine.  But it's clear to me that the jury

8   rejected all of the other evidence indicating the

9   defendant's guilt.

10          So, I was trying to surmise for him which

11  would be the facts, but then after that I said, "you

12  know, frankly, I'm not sure".  I know that the

13  acceptance of responsibility requires Brian to

14  acknowledge his criminal activity, but if I can't

15  figure out for him and assist him in determining what

16  those facts are, I don't think that it's fair to place

17  the burden upon him to try to do it himself.  And so,

18  because of my inability to ascertain what facts, I am

19  not able to counsel and advise him as to what it is he

20  needs to admit or not to admit.

21          So we discussed it prior to meeting with the

22  probation officer in the preparation of the presentence

23  report, and we came to the conclusion that since I

24  couldn't figure out what to advise him was the conduct

25  that he needed to admit, that the best alternative

1 would have been simply to say that we can't figure it

2 out. Whatever it is that he has done wrong, he has

3 admitted. In fact, during the course of his testimony,

4 he admitted the things that he had -- he had actually

5 done and those things that he hadn't done.

6 So, I think that the burden that probation

7 tries to place upon Brian in order for him to qualify

8 for acceptance of responsibility is a grossly unfair

9 burden, because Brian is an intelligent young man, and

10 I don't mean to sound conceitful in saying so, but I

11 don't think that he's quite as educated or intelligent

12 as I am, and yet I'm unable to provide him with the

13 advice that he needs. And maybe the court through its

14 recollections might have an idea of what it is that the

15 jury based its verdict upon. And it may be I'm just

16 not as intelligent as the court, but I still think that

17 these are circumstances that if -- maybe if he had

18 someone more intelligent than I as his counsel, he

19 might be in a position to be able to admit those facts.

20 So, I ask the court in computing the results

21 under the Sentencing Guidelines to give him the

22 acceptance of responsibility. I think that the --

23 THE COURT: That really kind of puts me in a

24 tough spot, because it asks me to give him credit for

25 accepting responsibility when he's saying in essence

1  that, well, I don't know how to accept responsibility

2  because I don't know what I did that the jury didn't

3  like. It would make it a lot easier for me if he were

4  to say that "I did deal in sufficient methamphetamine

5  to warrant the jury's verdict as to the middle range".

6          MR. VAN DE VELD: Well, Your Honor, I think he

7  admitted that he had been involved in drug dealing when

8  he testified on the witness stand. I think he

9  acknowledged that, but he indicated that he had nothing

10  to do with Eric Aponik --

11          THE COURT: Well, setting aside Eric Aponik,

12  does he admit that he did, that he dealt in sufficient

13  quantities of methamphetamine to justify the jury's

14  verdict as to the middle range?

15          MR. VAN DE VELD: I believe he would accept

16  that he did so.

17          THE COURT: Is that true?

18          THE DEFENDANT: Yes, Your Honor.

19          THE COURT: All right.

20          MR. VAN DE VELD: But my point was I couldn't

21  figure out the specific facts --

22          THE COURT: I hear you, I hear you. And I

23  accept your reasoning, and I'll hear from Ms. Johnson,

24  she'll probably turn me around on this, but I accept

25  your reasoning that it would be unfair to require him

1  to accept responsibility by pleading guilty to a bunch

2  of counts that he didn't feel he was guilty of, and

3  that the jury acquitted him on. That portion of your

4  argument I find very persuasive. And with his

5  additional admission, I'm reasonably satisfied that

6  he's entitled to the two-level reduction.

7       MR. VAN DE VELD: Thank you, Your Honor. The

8  five to 50 grams, the reason that I urge the court to

9  adopt the low end of the quantity range, and I

10 understand that --

11      THE COURT: I guess where I come down on that

12 is, first of all -- and I'll hear you out on this --

13 but my thinking, my current thinking is that he was the

14 beneficiary of some good lawyering and a sympathetic

15 jury that was willing to give him the benefit of the

16 doubt on the quantities. And, frankly, he got a very

17 big break from the jury, I think, when they acquitted

18 on 12 of the counts. And he ought to be quite happy

19 with the verdict.

20      MR. VAN DE VELD: I can understand Your Honor

21 feeling that way. I guess maybe it's my humility that

22 I don't take the position that the jury returned its

23 verdict because of my lawyering skills, but more

24 because of the proof. And, you know, I think I do a

25 decent job as a lawyer, but I don't think that that was

1    the sole reason that they rejected the government's

2    case.  I think they rejected the government's case

3    because of problems with the proof, and --

4            THE COURT:  And that's a valid observation.

5    I think that it's probably not in contest that there

6    were weaknesses in some of the aspects of the

7    government's case.

8            MR. VAN DE VELD:  And so based on that, I

9    think that if we -- if we just look, you know, at the

10   verdict itself, and we look at the range that is

11   provided in there, the question is which, which amount

12   in that range would they have been absolutely -- would

13   they have felt met the proof beyond a reasonable doubt

14   standard.  Because, unfortunately because the

15   sentencing guidelines break things into two different

16   levels between the amounts involved, maybe three

17   different levels, it's -- we're not certain as to which

18   level it is that they actually found.  We gave them the

19   ranges based upon the mandatory minimum requirements

20   within the statute, and that's how the interrogatory is

21   posed to them.  But within that middle range, there is

22   a breakdown of ranges based upon the sentencing

23   guidelines.  So which level can we be certain that they

24   found beyond a reasonable doubt?  Well, the five grams

25   is the minimum amount, but where along the line up to

1  50 do we start having problems?

2       THE COURT:  If it were 50 grams, assuming

3  you get a two-level reduction for acceptance of

4  responsibility and a criminal history category of IV,

5  that would give a -- start with a base offense level of

6  30, a reduction of two for acceptance of responsibility

7  would give a total offense level of 28.  That's

8  assuming the high end of the range, which will give a

9  guideline range of 135 to 168.

10      If you accept your argument of a minimum, the

11  minimum five grams, you start with a base offense level

12  of 26, less two for acceptance of responsibility, with

13  a criminal history category of IV, will give a

14  guidelines range of 77 to 96 months.

15      If you pick the mid-range, that is, add two to

16  the bottom, the five-gram base offense level, that will

17  give you a base offense level of 28, less two for

18  acceptance of responsibility, would give you a total

19  offense level of 26, with a criminal history category

20  of IV, gives a guideline range of 92 to 115  months.

21      So one way to reason yourself to a conclusion

22  if you feel wed to the guidelines, which I don't, would

23  be then a mid-range of the middle verdict range of 92

24  to 115 months.

25      MR. VAN DE VELD:  Thank you.  And, Your Honor,

1   I agree with you, and those are the -- the reason that

2   I go through these arguments is because the sentencing

3   law following *Booker, Fanfan* and *Emeline* indicates that

4   we must first derive what the actual guideline

5   application should be, because that's to be considered

6   overall in sentencing.  Then the court is free to use

7   that simply as a recommendation to the court as to what

8   sentence it should impose, and it's only restricted by

9   the mandatory minimums and the actual maximums under

10  the statute in imposing sentence.

11          THE COURT:  And the factors of 18 USC, 3553.

12          MR. VAN DE VELD:  Correct.  And that then

13  leads me to the second part of what it is that I wanted

14  to say on behalf of my client, which is relative to how

15  the court should sentence him.  I think the court

16  firmly grasps the arguments that I have raised

17  concerning the guidelines, so I won't belabor those

18  any further.  What I'd like to do is point out a little

19  bit about Brian and his life.

20          Brian has a history of having committed

21  crimes, that's why he has a criminal history category

22  other than I.  Brian lacked a real adult father figure

23  in his life most of his upbringing, and Brian got

24  involved in doing things with his friends in school

25  that led to him having left school early and not

1   completing high school. When he was sentenced on

2   most of his offenses, other than the first time that

3   he served sometime in a federal facility, he goes to

4   serve time, but there are no rehabilitation programs

5   that are made available for him. The one time that

6   rehabilitation programs were made available for Brian

7   was a very short period of time that he served, and

8   during that period of time, Brian completed his GED.

9       I suppose it's only based upon my personal

10   knowledge of Brian that--and it's not evidence that

11   I can offer to the court--but I don't see Brian as the

12   kind of person who has ill intent or is the kind of

13   individual who wants to harm anyone. He doesn't, he

14   does not appear to me to have a malicious intent at all

15   in any respect. I think he's, he's basically gotten

16   involved in the activities that he has gotten involved

17   in because of his associations, his friends, and in

18   pursuit of financial support.

19       Brian is, whatever period of time Your Honor

20   will sentence him to, Brian is going to be in a

21   facility where he's going to spend a considerable

22   period of time in prison. And during that period

23   of time Brian will make use of that time to better

24   himself. I think that Brian understands this, this

25   period of imprisonment has taken from him being able

1  to be a father to his own son, and made it so that he

2  cannot fulfill the obligations that he feels to his

3  son and to the woman that he has been in love with for

4  a great many years, Keomi Lujan, who testified at

5  trial.  And now he knows that he won't be there for

6  some of the most significant events in their lives.

7  And it has, I think it has had a significant and

8  profound effect upon him.

9          So for those reasons, Your Honor, I ask Your

10  Honor to sentence Brian with as much leniency as Your

11  Honor feels that you, in your good conscience, can do

12  so because I do think that he will make good use of the

13  time that he does serve so that when he is able to be

14  released, he will be able to be a productive member of

15  the community, and I hope will no longer engage in

16  criminal conduct.

17          Thank you, Your Honor.

18          THE COURT:  Does your client wish to say

19  anything?

20          MR. VAN DE VELD:  I believe he does, Your

21  Honor.

22          THE COURT:  All right.  Step up to the

23  lectern.  Go ahead.

24          THE DEFENDANT:  Thank you, Your Honor.

25          First of all, can I acknowledge my son?

1  THE COURT: Sure.

2  THE DEFENDANT: Son, I want you know that I've

3  been going through this for a long time.

4  COURT REPORTER: I can't hear him, Your Honor.

5  THE COURT: You'll have to speak up, Mr. Elm.

6  THE DEFENDANT: I've made a lot of bad

7  mistakes in my life in the past that I'm going to pay

8  for today. It's very important to me that you listen

9  to your mother, stay in school, choose your friends,

10  stay away from drugs, and don't do the things that will

11  get you in trouble. Please understand that this is the

12  reason why I am being punished, because of my past and

13  the wrong decisions that I have made.

14  Son, I'm very sorry that I won't be out there

15  with you for a long time, and I'm sorry for all the

16  things I'm going to miss in the years to come. But I

17  promise you when I get out, I will make it up to you

18  when I come home. Please understand that I love you,

19  and I only want the best for you. I'm telling you this

20  because I don't want you to go through the things that

21  I'm going through today. Be strong, son, just hang in

22  there.

23  Keomi, I'm sorry that things ended up this

24  way. And I'm sorry for putting you through all this

25  pain and suffering. I'm sorry that I wasn't around

1 when you most needed me. And I'm sorry for not being

2 out there to help you with our son. Most of all, I'm

3 sorry that I won't be able to do all these things for

4 a while.

5 Thank you for the encouragement, the comfort,

6 the patience, the support, the loyalty, understanding

7 and the love that you have given me throughout these

8 hard times. I thank you for believing that I can

9 change, and that things could get better. I thank you

10 for you just being you. You're a wonderful person that

11 everybody loves, and like a magnet to everyone. You

12 are the strongest person I know. I cannot express how

13 grateful I am for a person like you to be by my side.

14 You are the best -- you and Keanu are the best things

15 that ever happened to me in my life, and I'm very

16 fortunate that I caught your attention.

17 I hope that you find it in your heart to

18 forgive me for failing you and Keanu, and I'm hoping

19 that the both of you can give me a chance to make

20 things better in the future. I promise that I would

21 never jeopardize us again.

22 THE COURT: Anything else?

23 THE DEFENDANT: Your Honor, after the trial

24 I spoke to Mr. Van de Veld and I asked him what was the

25 evidence of my conviction, because I couldn't figure

1  it out, how the jury arrived with five to 50 grams.

2  Mr. Van de Veld said he couldn't figure it out either.

3  If I was to know how the jury was able to reach that

4  verdict, I would have admitted my guilt.  Your Honor,

5  I've been in trouble for a long time with the law, I've

6  made a lot of wrong decisions in my life that led to

7  the loss of my freedom, but I always admitted my guilt.

8      I didn't take the steps to stay out of

9  trouble, but I won't let that happen again.  I can be a

10  better person, a better father to my son.  I can live

11  without drugs or getting into trouble.  I just want to

12  get through this, and be out there with my family to

13  support them.  Please, recommend that I take vocational

14  studies so that it will help me find a good job when I

15  get out.

16      All I'm asking today, Your Honor, is to

17  sentence me with leniency.  Thank you.

18          THE COURT:  All right.  Ms. Johnson?

19          MS. JOHNSON:  May it please the court.  Thank

20  you, Your Honor, for coming back to Guam.  You're the

21  one who heard the trial, and you've saved Mr. Van de

22  Veld and myself hours of having to recount to another

23  trial judge what our recollection of the case was, and

24  arguing the evidence back and forth.

25          THE COURT:  And believe me, if I had the

1 choice, I would have let you spend the hours rather

2 than me spending 13 hours on an airplane each

3 direction.

4      MS. JOHNSON: Well, I thought a telephonic

5 conference would accomplish it; in other words, it's

6 not my fault you're back here. But certainly I think

7 that it helps to have the trial judge do the

8 sentencing.

9      Concerning the presentence report, the

10 government filed a strong objection to it. It's as

11 if the trial had not occurred when you read the

12 presentence report. It does not take into account any

13 of the testimony, that the defendant was the one who

14 started this ring, that he recruited his brother-in-

15 law, that he had John Cruz selling for him, that he was

16 the one dealing with the people in Las Vegas, the one

17 talking to them. He should receive a four-level

18 increase as the organizer and the leader of this

19 activity.

20      It does not surprise me that the jury returned

21 the verdict it did, because when this case was broken

22 in June of 2005, the defendant was in jail. And the

23 one hundred grams that Mr. Aponik and Mr. Espinosa were

24 bringing in is not the way they started out. Initially

25 they started out in October--you may recall the

1   defendant got his own cell phone then and made hundreds

2   of calls after that--that they were bringing in two to

3   five gram quantities at a time in greetings cards. And

4   that I think is what the jury convicted him of, the

5   three to five gram quantity that went on in October,

6   November, December and January. And of course you

7   can't tell exactly how many there were, and that's why

8   they settled on that middle range. I don't see that

9   incongruous or unreasonable at all.

10           The point is that this man was charged in

11  Count One with the conspiracy that he was charged with,

12  and that is, what occurred between June of 2004 and

13  June of 2005, not some other case, not his prior drug

14  dealing before then, but this particular case.

15           He got on the stand and he flatly denied

16  everything that the witnesses were saying. He said he

17  got his own cell phone so that he and his wife could

18  talk to each other. He denied using drugs at all. He

19  called his Superior Court probation officer to say that

20  he had tested clean throughout this entire period of

21  time, and he denied using or dealing any ice at all

22  during the period of time that this indictment

23  concerned. I'm going now towards his acceptance of

24  responsibility. This was under oath. Is he now saying

25  that in fact his testimony at trial was false? Because

1   that is the only way that he can get acceptance of

2   responsibility.  For him -- it's not clear to me what

3   this admission is.

4          Counsel said that he's done ice at some time.

5   This is the trial and this is what counts.  And if his

6   testimony under oath is to be taken into effect, then

7   he's innocent and there's nothing for him to accept.

8   So that I think is an important question.  Is he saying

9   that his testimony under oath was false?

10          I think that the testimony stands as it is,

11   the exhibits stand as they are, that this man started

12   this operation ith three to five gram quantities, and

13   he should be held accountable for that.

14          Thank you.

15          THE COURT:  All right.  Let me start by saying

16   that despite Mr. Elm's criminal background and the fact

17   that he scores high on the criminal history category, I

18   don't conclude that he's an evil person.  Nobody could

19   be totally bad and have the support of the spouse that

20   Mr. Elm enjoys, and have raised a son that's impressive

21   as your young son, Mr. Elm.

22          It does need to be said, though, that one of

23   the things that is very apparent to me is that this

24   island has a very serious problem with methamphetamine,

25   even more of a problem than we have in the mainland.

1  I don't know why, but it does seem to be more pervasive

2  here than in some other sections of the United States.

3       The other thing that is apparent to me is

4  that young people who don't have the background and

5  experience of somebody such as myself with over 25

6  years of dealing with the drug business, they don't

7  understand how serious methamphetamine is.  Those of

8  us who've been around as long as I have have dealt with

9  all sorts of drugs, including Angel Dust, and LSD, and

10 crack cocaine and flake cocaine and heroin, Ectasy, but

11 the methamphetamine is just about as bad as I've had to

12 deal with in terms of its addictive qualities, its

13 impact upon people's cognitive abilities and their

14 physical bodies.  And one of the serious problems with

15 it is that it's so inexpensive, and young people don't

16 really seem so think that there's anything that bad

17 about it.  It's kind of like marijuana, it seems, when

18 in fact -- and they get a mixed message.  I mean, we

19 have military pilots who use methamphetamine to stay

20 alert in the cockpit, and the message one gets from

21 that is, well, maybe if the government hands it out to

22 pilots, it's not that bad a deal.  But it is.

23       So, in formulating a sentence that seems to me

24 that trying to balance the good things about Mr. Elm

25 against the bad things of what he did, and this drug

1    traffic, makes the formulation of a sentence extremely

2    difficult.

3          I begin with the guidelines calculations, and

4    I'm concluding that the best way to approach it is to

5    assume the mid range of the jury's verdict range, which

6    would then give a base offense level, as said earlier,

7    of 28.  Giving the defendant credit for acceptance of

8    responsibility, and I agree it's a close question, and

9    not a slam dunk, but on the other hand, I think that

10   when you're confronted with pleading guilty to a number

11   of counts that you don't feel you're guilty about, and

12   the jury concluded that he wasn't guilty of a number of

13   counts, it's not fair to refuse to give acceptance of

14   responsibility to a defendant that's confronted with

15   that kind of a dilemma, so I'm giving him credit for

16   acceptance of responsibility, which gives a total

17   offense level of 26, and with a criminal history

18   category of IV, would give a guideline range of 92

19   to 115 months.

20         Beginning with that guideline calculation, and

21   then considering the factors of 18 USC, Section 3553,

22   particularly trying to arrive at a sentence that is

23   sufficient but not excessive to give credit for the

24   seriousness of the offense, the seriousness of the

25   problem confronted by the District of Guam, the need

1   to deter others from getting involved in this business,

2   but also giving the defendant credit for his parental

3   responsibilities and trying to get him back to his

4   family as soon as possible, I conclude that the

5   appropriate sentence is a period of confinement of

6   84 months, and a period of supervised release of four

7   years to commence upon the defendant's release from

8   confinement, subject to the standard conditions as set

9   forth in the recommendation of the probation office,

10   except that I'm not imposing the 300 hours of community

11   service. I understand that's been the history of this

12   district in the past; I just don't think it's necessary

13   to burden the defendant with that.

14        You're required to pay the special assessment

15   for the count of conviction of one hundred dollars.

16        Mr. Elm, you may have a right to appeal this

17   sentence. If you wish to file a notice of appeal, it

18   must be filed within 10 days of today. If you wish the

19   assistance of an attorney in filing a notice of appeal

20   and cannot afford one, one will be appointed to assist

21   you if you so request. If you wish the assistance of

22   the clerk in filing a notice of appeal, she will assist

23   you if you so request. Do you understand?

24        THE DEFENDANT: Yes, Your Honor.

25        THE COURT: And I'd like to leave you with one

```
1    other thought, Mr. Elm, and that is, I was very moved
2    by your comments to your son.  And I would suggest that
3    your commitment to him that you not engage in conduct,
4    when you get out, that would again put your family in
5    jeopardy is a very solemn and sacred commitment, more
6    important than anything you say to me.  And I hope that
7    you, when you get out, that you remember what you said
8    to your son, and that you are able to look him in the
9    eye when you get out and say, "I lived up to my promise
10   to you".  All right?
11           Anything further?
12           MR. VAN DE VELD:  Your Honor, concurrent or --
13           THE COURT:  Yes.
14           MR. VAN DE VELD:  -- to this present sentence?
15           THE COURT:  Yes.
16           MR. VAN DE VELD:  Thank you.
17           And one last thing, Your Honor.  Could the
18   court make a recommendation that he be returned to
19   Lompoc?
20           THE COURT:  Yes.
21           MR. VAN DE VELD:  Thank you.
22           THE COURT:  Oh, yes.  And I should state for
23   the record, I'm waiving a fine due to the defendant's
24   financial condition.
25           MR. VAN DE VELD:  Thank you.
```

1        THE COURT:  All right.  Thank you, counsel.

2        THE DEFENDANT:  Thank you, Your Honor.

3        (Proceedings concluded.)

4                        *  *  *

5

6

7               CERTIFICATE OF REPORTER

8

9   CITY OF AGANA        )
                         ) ss.
10  TERRITORY OF GUAM    )

11

12       I, Wanda M. Miles, Official Court Reporter

13  of the District Court of Guam, do hereby certify the

14  foregoing pages 1-27, inclusive, to be a true and

15  correct transcript of the shorthand notes taken by me

16  of the within-entitled proceedings, at the date and

17  time therein set forth.

18       Dated this 11th day of October, 2006.

19

20              Wanda M. Miles
        _____

21

22

23

24

25

Wanda M. Miles
Official Court Reporter
District Court of Guam