**TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601

*Attorneys for Defendant*

**FILED**
DISTRICT COURT OF GUAM

JUN 1 9 2007

**MARY L.M. MORAN**
**CLERK OF COURT**

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 07-00026 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S TRIAL EXHIBITS** |
| | ) | |
| BRIAN ELM, | ) | |
| | ) | |
| Defendant. | ) | |

The exhibits which Defendant intends to introduce during the trial of the above-captioned action are described below. Additionally, Defendant reserves the right to use any exhibits on the United States' exhibit list.

A.     Original Indictment in Criminal Case No. 05-00053 (still awaiting production from the United States).

B.     Testimony of Brian William Elm (with pages 45 through 48 intentionally omitted).

Respectfully submitted this 19th day of June, 2007.

**TEKER TORRES & TEKER, P.C.**

By _____
**JOSEPH C. RAZZANO, ESQ.**
*Attorneys for Defendant*

ORIGINAL

# DEFENDANT, BRIAN ELM'S EXHIBIT LIST

| Exhibit | Date | Description | Identified | Admitted |
|---------|------|-------------|------------|----------|
| A | | Original Indictment, Criminal Case No. 05-00053 | | |
| B | | Testimony of Brian William Elm, Criminal Case No. 05-00053 (with pages 45 through 48 omitted) | | |

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTNA, GUAM 96910
TELEPHONE: (671) 477-9891-4

# EXHIBIT "A"

# EXHIBIT "B"

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

* * *

# FILED
### DISTRICT COURT OF GUAM

## OCT 2 4 2006

## MARY L.M. MORAN
## CLERK OF COURT

UNITED STATES OF AMERICA,    )  **COURT OF APPEALS**
                             )     **CASE NO. 06-**
              Plaintiff,     )
                             )
      vs.                    ) CRIMINAL CASE
                             )     NO. CR05-00053
BRIAN WILLIAM ELM,           )
                             )
              Defendant.     )
_____)

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE JOHN C. COUGHENOUR

Designated District Judge

**DEFENDANT'S TRIAL TESTIMONY**

**MONDAY, MAY 15, 2006**

US Attorney's Office
Districts of Guam & NMI

OCT 25 2006

Time _____ 3pm
Receiving name _____
Date keyed in Dbase ___ 10/25
Entered into Dbase by:

Wanda M. Miles
Official Court Reporter

GOVERNMENT
EXHIBIT
2

1    **APPEARANCES:**

2

3    FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                                BY:  KARON V. JOHNSON, Esq.
4                               ASSISTANT UNITED STATES ATTORNEY
                                Suite 500, Sirena Plaza
5                               108 Hernan Cortez Avenue
                                Hagatna, Guam  96910
6

7    FOR THE DEFENDANT:        LAW OFFICES OF VAN DE VELD,
                                    SHIMIZU, CANTO & FISHER
8                               BY:  CURTIS C. VAN DE VELD, Esq.
                                167 East Marine Corps Drive
9                               Hagatna, Guam  96910

10        ------------------------------------------

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I-N-D-E-X

2    DEFENSE WITNESS        DIRECT     CROSS     REDIRECT

3    Brian W. Elm            4           41         67

4

5

6                      E-X-H-I-B-I-T-S

7    GOVERNMENT EXHIBIT              INTRODUCED/ADMITTED

8     7 - Phone records             16/24/54

9     8 - Phone & deposit records   20

10   14 - Phone & deposit records   23

11   13 - Phone & deposit records   24

12   12 - Phone & deposit records   26

13   11 - Phone & deposit records   28

14    9 - phone & deposit records   29

15   10 - phone & deposit records   31

16   31 - (Court documents relating   41/68      42
17   32 - (to Defendant B. Elms'      41         42
     33 - (felony convictions         41         42

18   34 - Plea agreement              42

19   26 - Phone records               58

20    4 - Phone records               62/67

21   28 - phone records               64

22

23

24

25

1          HAGATNA, GUAM; MONDAY, MAY 15, 2006

2                        * * *

3          (BRIAN WILLIAM ELM, the defendant herein, was

4     first duly sworn and testified as follows:)

5               THE CLERK:  Take the stand.

6          State your full name and spell your last name.

7               THE DEFENDANT:  Brian William Elm, E-L-M.

8                    DIRECT EXAMINATION

9     BY MR. VAN DE VELD:

10         Q.    Brian, why don't we first start off, I want to

11    talk to you about your work history.  Can you please

12    explain to the jury what your work history was; let's

13    start with the beginning of January of 2004.

14         A.    The beginning of January 2004, uhm, I worked

15    at -- or I wasn't working at the time.  I think it's

16    January -- July I worked at Marriott, and I worked

17    there for approximately two weeks.  And after I worked

18    there I went to work at Okura Hotel, from August to

19    December of 2004.  And off and on I'll be working down

20    at the office, Reaction, Eric's father's, uh, his --

21    the office they opened down there, in Agana.

22         Q.    And when did that start, that you would work

23    on and off at the Reaction office?

24         A.    Well, basically, Eric would just ask me to

25    help him out, and on occasions, but then I started

1   working there like on a full time basis on January to

2   February of 2005.

3       Q.   Did you report all changes in your employment

4   status to anyone?

5       A.   Yes, I did.

6       Q.   Who did you report them to?

7       A.   To my probation officer.

8       Q.   When did you start that pretrial probation

9   monitoring?

10      A.   I believe it's in September of 2003.

11      Q.   What caused that reporting to start?

12      A.   I got arrested for possession, and possession

13  of firearm.

14      Q.   You said you got arrested for possession and

15  possession of a firearm.

16      A.   Yes.

17      Q.   When you say you got arrested for possession,

18  what do you mean?

19      A.   They had found a, uh, straws in a backpack I

20  was carrying, and a pipe.

21      Q.   Okay.  And what was inside the straws?

22      A.   Uh, residue, from meth.  Meth residue.

23      Q.   And whose backpack was it?

24      A.   It was my backpack.

25      Q.   And do you know how long those items had been

1   in your backpack?

2       A.   Uhm, maybe two days.

3       Q.   So at that time you had been using; is that

4   correct?

5       A.   Yes.

6       Q.   Okay.  Following your arrest, when was the

7   next time you used ice?

8       A.   I didn't use ice after that.

9       Q.   Now, in 2003, what kind of a vehicle did you

10  own?

11      A.   I owned a Yamaha, '01 model, it was a YZF600R.

12      Q.   Okay.  Was that a car or a motorcycle?

13      A.   I owned a 1998 Nissan Altima before that; in

14  early 2003, I sold it and I got the Yamaha motorcycle.

15      Q.   Okay.  Do you recall how much you sold the

16  Nissan Altima for?

17      A.   $8,000.

18      Q.   And who did you sell it to?

19      A.   Vince Cruz.

20      Q.   Is that Vince Cruz from Merizo?

21      A.   No, he was from Dededo.

22      Q.   And you said you sold it for $8,000.  How much

23  did you buy the motorcycle for?

24      A.   5,000.

25      Q.   So what did you do with the difference?

1     A.    I just saved it.

2     Q.    Did there come a period of time when you

3   acquired a different vehicle?

4     A.    Yes, in early 2004 I had sold my Yamaha, the

5   one I bought for 5,000, I sold it for 4,000 to a guy

6   named Jess from Barrigada.

7     Q.    You sold the motorcycle for 4,000, and what

8   did you buy?

9     A.    I bought a, the Suzuki motorcycle from Eric

10  Aponik for 4,000, but I gave his dad 1500 for the bike

11  because Eric I believe owed his dad money, so, I gave

12  him $1500, and I used the remaining to buy rims for

13  Keomi's runner, 4Runner.

14     Q.    So that I understand this correctly, are you

15  saying you gave 4,000 to Eric, a $1,500 to his father,

16  and then you used the difference?

17     A.    No, I gave -- they had -- we agreed that I was

18  going to buy the bike for 4,000, but I gave, instead I

19  gave them 1500 and I asked them if I can work off the

20  difference, and the remaining I used to purchase the

21  wheels for the Runner, Keomi's Runner.

22     Q.    Did there come a time when you bought a

23  different vehicle?

24     A.    Yes.

25     Q.    When was that?

1      A.    Uhm, I believe it was either late 2004 or

2   early 2005.

3      Q.    What did you buy?

4      A.    I had purchased a -- I sold my, the motorcycle

5   I bought from Eric to Chris for 7500, and I bought a

6   Toyota, white Toyota 4Runner which I purchased for

7   $6,000.

8      Q.    So, you were able to sell the motorcycle that

9   you had acquired from Eric for a profit; is that

10  correct?

11     A.    Yes, that's correct.

12     Q.    And then you used part of the money that you

13  received to buy the white 4Runner?

14     A.    Yes.

15     Q.    Okay.  What did you do with the additional

16  money that you had from the sale of the motorcycle

17  after buying the 4Runner?

18     A.    I don't remember what I did.

19     Q.    Okay.  Did you make any improvements to the

20  white 4Runner?

21     A.    Oh, the rims that were on Keomi's Runner, the

22  stock wheels, I put it on the white 4Runner.

23     Q.    Okay.  So, after you had purchased the other

24  rims for Keomi's 4Runner --

25     A.    Yes.

1    Q.    -- that were the previous ones that were on

2    the car at the time --

3    A.    Yes.

4    Q.    -- that were left over, is that what you're

5    saying?

6    A.    Yes.

7    Q.    And you took those rims and you put them on --

8    A.    The white 4Runner.

9    Q.    -- the white 4Runner that you purchased?

10   A.    Yes.

11   Q.    Did you do anything else to improve the white

12   4Runner?

13   A.    Yes, I had purchased sounds.

14   Q.    Where did you buy the sound system?

15   A.    Uttam's.

16   Q.    Do you remember how much you spent?

17   A.    About a thousand some; don't remember.

18   Q.    How long did you own the white 4Runner?

19   A.    Less than a month.

20   Q.    Who did you sell it to?

21   A.    I sold it to Eric Aponik.

22   Q.    Why did you sell it to him?

23   A.    I wanted to purchase his cousin's motorcycle.

24   Q.    How much did you sell it to Eric for?

25   A.    7,500.

1   Q.   Were you paid in cash?

2   A.   Yes.  He actually gave me six thousand and

3   said he would pay me the rest later.

4   Q.   How much did you buy the motorcycle for?

5   A.   I believe it was seven, or seven -- 7500.

6   Q.   And who did you buy that from?

7   A.   John Dudkiewicz, Eric's cousin.

8   Q.   When you started working on and off at

9   Reaction Supply Company, how much were you earning?

10  A.   It varies, it depended on how -- how long I

11  stayed at work.  About, they would pay me $10 an hour.

12  Q.   Was that both before you started working there

13  regularly, or just during the period of time that you

14  were on and off?

15  A.   During the period of time when I was off and

16  off.

17  Q.   How much did you make when you started working

18  there in January of 2005?

19  A.   About four to five hundred dollars a week.

20  Q.   Do you know John Vincent Cruz from Merizo?

21  A.   Yes, I do.

22  Q.   How do you know John?

23  A.   Uhm, like barbecues I go to in Merizo, or my

24  cousin Katrina, that's her *pare*.

25  Q.   How long have you known John?

1    A.    About five, five years, six years.

2    Q.    Did there come a time when you -- you said you

3    used to see him when you would go to barbecues.  Did

4    there come a time when you became more familiar with

5    Mr. Cruz?

6    A.    No.

7    Q.    When you worked at Reaction Supply, how often

8    would you see Mr. Cruz at the premises of Reaction

9    Supply?

10   A.    Uhm, I saw him there a couple of times, maybe

11   two or three times.

12   Q.    And when you saw him there, what was occurring

13   that caused him to be there, that you were aware of?

14   A.    He would just be talking to Eric Aponik.

15   Q.    Do you know Jonathan Canovas?

16   A.    Yes.

17   Q.    How do you know Johathan Canovas?

18   A.    My cousin Derek used to bring him around when

19   we had barbecues and stuff like that, family

20   gatherings.

21   Q.    Did you come to know him better over some

22   period of time?

23   A.    Yes.

24   Q.    Can you explain that?

25   A.    Well, sometimes he would call my phone to, to

1    try and get ahold of Eric, and he would just start

2    talking to me about stuff.

3        Q.    When did he start calling you trying to get

4    ahold of Eric through you?

5        A.    Like in -- I'm not sure.

6        Q.    You've seen some of the phone records that the

7    government has provided in this case, is that correct?

8        A.    Yes.

9        Q.    And you've seen that some of the phone calls

10    are like six minutes, some are up to 15 minutes?

11        A.    Yes.

12        Q.    What kinds of things would he talk to you

13    about in those phone calls?

14        A.    Well, most of the time he'll be out in a bar

15    or in a casino gambling and he'll just tell me about,

16    you know, what he's doing.  And he used to tell me that

17    his friends just leave him and he's lost, he don't know

18    where he's at.  Calls me when he walks the strip in

19    Vegas.

20        Q.    And what did he talk to you about?

21        A.    Just that his friends left him with some

22    people, and he's trying to look for them.

23        Q.    Did you ever talk to him about drugs?

24        A.    No.

25        Q.    So, if he calls you looking for Eric, what

1    would you do?

2        A.    I would, uh, try and get ahold of Eric for

3    him, and I'll tell him just call me back.

4        Q.    You'd tell who to call you back?

5        A.    Jonathan Canovas.

6        Q.    Did you know why he was trying to get ahold of

7    Eric?

8        A.    No.

9        Q.    The cell phone that Keomi got for you from

10   i-Connect, were you the only one who used that phone? .

11       A.    No.

12       Q.    Who else would use it?

13       A.    Sometimes Eric would use the phone.

14       Q.    Why would Eric use your phone at times?

15       A.    His batteries are weak on his phone.

16       Q.    So, his batteries are weak.  I'm not -- I

17   don't understand that.

18       A.    Well, sometimes his phone is dead.

19       Q.    So his phone wouldn't be usable?

20       A.    Yes.

21       Q.    So he would use your phone, is that what

22   you're saying?

23       A.    Yes.

24             (Pause to gather up exhibits.)

25             MR. VAN DE VELD:   Your Honor, may I approach

1   the witness?

2          THE COURT:  Yes.

3          MR. VAN DE VELD:  Thank you.

4      Q.   First I'm showing you what's marked as Exhibit

5   1; and do you recognize what's depicted in Exhibit 1?

6      A.   No, I don't.

7      Q.   And have you ever seen a package similar to

8   that?

9      A.   No, I don't.

10     Q.   Now, I'm now showing you what's marked as

11  Government Exhibit No. 5, ask if you can take a look at

12  that.

13     A.   (Witness complies.)

14     Q.   Those are deposit slips for the Bank of Guam;

15  have you ever seen any of those before?

16     A.   No.

17     Q.   Have you ever deposited money into a bank

18  account for Johathan Canovas?

19     A.   No.

20     Q.   Have you ever accompanied anyone to deposit

21  money into the bank account of Johathan Canovas --

22     A.   No.

23     Q.   -- at Bank of Guam?

24          Have you ever given money to anyone for the

25  purpose of depositing money into the bank account of

1    Johathan Canovas?

2        A.    No.

3        Q.    Have you ever wired money from any account

4    that you have to Johathan Canovas?

5        A.    No.

6        Q.    Have you ever given money to anyone to wire

7    transfer via Western Union money to Johathan Canovas?

8        A.    No.

9        Q.    Have you ever given money to someone to

10   deposit into a bank account for Christopher Espinosa?

11       A.    No.

12       Q.    Have you ever given money to anyone and

13   instructed them to wire money to Christopher Espinosa?

14       A.    No.

15       Q.    Have you ever received packages in the mail

16   from Johathan Canovas that contained controlled

17   substances in them?

18       A.    No.

19       Q.    Have you ever received packages from

20   Christopher Espinosa that contained controlled

21   substances in them?

22       A.    No.

23             (Pause.)

24             THE COURT:  Let's take a morning recess, 15

25   minutes.

1            (Recess was taken at 10:46 a.m.)

2            THE COURT:  This your last witness?

3            MR. VAN DE VELD:  Yes, Your Honor.

4            THE COURT:  Do you anticipate any rebuttal?

5            MS. JOHNSON:  Possibly, I'm not sure.

6            (The jurors are now entering the courtroom.)

7            THE COURT:  Go ahead and be seated folks.

8  BY MR. VAN DE VELD:

9     Q.    Brian, I'm showing you what's marked as

10  Exhibit No. 7 and I'm directing your attention to the

11  first page where it starts listing incoming telephone

12  numbers.

13        Now, according to the chart these your phone

14  calls with Eric Aponik, and on the first page it

15  indicates several phone calls between you and Eric

16  Aponik.  Can you tell me whether or not that was

17  something which was unusual?

18     A.    No.

19     Q.    Why?

20     A.    Can you repeat the question again?

21     Q.    Yes.  It indicates --

22        MS. JOHNSON:  Objection.  Could counsel go

23  back to the microphone?  I can't hear him.

24        MR. VAN DE VELD:  Okay.

25     Q.    Take a look at the first page, it shows

1    telephone numbers, it shows telephone calls between you

2    and Eric over the course of several days.  Was that

3    something which was unusual?

4        A.    No.

5        Q.    Why?

6        A.    We -- we call each other all the time.

7        Q.    And what would you call each other about?

8        A.    Like what we would do after work or, you know,

9    what we're doing, what he's doing, what I'm doing.  I'm

10   basically -- I just -- if I'm the one calling him it's

11   because I'm bored, I sit there at work and like if

12   there's nobody in the pool, I would just start calling.

13       Q.    So you said and if you're at the pool and

14   there's nobody in the pool and you're bored, you just

15   start calling?

16       A.    Yes.

17       Q.    Was Eric the only one that you called or other

18   people?

19       A.    There's other people.

20       Q.    Who else would you call?

21       A.    I call Keomi, I call my cousins, I call my

22   brother, family.

23       Q.    Now, if you turn further into the exhibit

24   there's another page that I've put a Post-It note flag

25   on.  What page is that?

1    A.    Page 8.

2    Q.    Okay.  On there it indicates phone calls that

3    came from Johathan Canovas; do you recall receiving

4    those phone calls?

5    A.    From Johathan Canovas?

6    Q.    Yes.

7    A.    Is that page 8?

8          MR. VAN DE VELD:  May I approach, Your Honor?

9          THE COURT:  Yes.

10   A.    Or 7?

11              (Defense counsel went to the witness

12               stand to help the witness.)

13   A.    Okay.

14   Q.    Do you recall receiving those phone calls?

15   A.    I can't say.

16   Q.    Okay.  If you go back to the earlier pages

17   there, it indicates, for example, a blocked telephone

18   number, and then it will indicate a call, and the

19   duration of the call; do you see that on the bill?

20   A.    Yes.

21   Q.    And do you know why it is that it reflects

22   that?

23   A.    No.

24   Q.    Okay.  Have you ever received a phone call

25   where the sender on the cell phone doesn't want the

1    number that they're calling from to be shown?

2        A.    Uh, yes.

3        Q.    Okay.  And when that happens, what does it

4    show on your cell phone?

5        A.    I believe blocked.

6        Q.    But the phone call still appears on your bill

7    for the time that you spent on the phone?

8        A.    Yes.

9        Q.    Is that correct?  Also shown in the records in

10   blue highlight are some phone calls from John Vincent

11   Cruz; do you recall receiving those phone calls?

12       A.    Yes.

13       Q.    Okay.  And when you received those phone

14   calls, what conversations did you have with John Cruz?

15       A.    He would ask me how would I -- how would --

16   how is it that he would be able to get ahold of Eric

17   Aponik.

18       Q.    And what would you tell him?

19       A.    I would just say try calling his house or his

20   cell phone.

21       Q.    Okay.  Now some of the phone calls reflect

22   that they would -- that they occurred during the

23   daytime.  So where would you have been when you

24   received those phone calls, in let's say the months of

25   October and November and December of 2004?

1    A.    At work.

2    Q.    And where would that have been?

3    A.    Okura Hotel.

4          (Counsel approached the witness again.)

5    Q.    Showing you what's marked as Exhibit 8, I've

6    put a Post-It note with the time on it; would you

7    please take a look at Exhibit 8 tell me when you've

8    finished reviewing it?

9    A.    Okay.

10   Q.    Okay.  Now, at the top of the exhibit is an

11   indication of a deposit, and then there is this

12   indication of telephone traffic below that.  And you

13   understand that's how the exhibit works, is that

14   correct?

15   A.    Yes.

16   Q.    Okay.  But the exhibit doesn't have the time

17   on the day that the deposit was made reflected on it,

18   so I've -- from the testimony of the Bank of Guam

19   person, I've put a little Post-It note there for you

20   indicating the time.  Can you tell me the phone calls

21   that are reflected in the exhibit immediately prior to

22   and after the time shown on the little Post-It note?

23   A.    (Pause to examine exhibit.)

24         10/13/04, 10:33 a.m., Eric Aponik -- from Eric

25   Aponik through, to Brian Elm.

1      Q.    Okay.  That's at what time?

2      A.    10:33.

3      Q.    Okay.  And that's immediately after or before

4 the time on the Post-It note?

5      A.    After.

6      Q.    Okay.  And at that time, where would you have

7 been?

8      A.    At work.

9      Q.    Okay.  And the difference between the time of

10 the deposit and the time of the phone call is how much

11 time?

12      A.    Four minutes.

13      Q.    Okay.  So, if you had been with Eric Aponik

14 and given him the money to make the deposit, why would

15 he need to call you within four minutes of it?

16      A.    I wouldn't know.

17      Q.    Okay.  What about the phone call that's

18 immediately preceding that?

19      A.    Is that on 10-14?

20      MR. VAN DE VELD:  May I approach, Your Honor?

21      THE COURT:  Yes.

22      MR. VAN DE VELD:  (Approaching the witness.)

23      Q.    What's the time of the phone call that

24 immediately precedes the time of the deposit?

25      A.    9:08 a.m.

1    Q.    And who's calling who?

2    A.    I'm calling Eric.

3    Q.    Okay.  Now, do you know what that -- can you

4    recall what that phone call was about?

5    A.    Just probably checking what we're going to do

6    later on, in the evening.

7    Q.    At that time you were employed where?

8    A.    Okura.

9    Q.    Okay.  What are the hours of operation of the

10   pool at the Okura Hotel?

11   A.    From eight to six.

12   Q.    From eight in the morning?

13   A.    8:00 a.m. to 6:00 p.m.  Sometimes they open

14   until seven.

15   Q.    Okay.  How early do people start actually

16   using the pool?

17   A.    Sometimes people would come down before that,

18   but I'll be there, and I'll allow them to -- I'll be

19   there earlier and I'll allow them to swim, because I'm

20   there to monitor them.

21   Q.    What are usually the boring parts of the day?

22   A.    I'd say lunch time.

23   Q.    So, you said that you had a phone call with

24   Eric at around 9:00 o'clock, and you said you think

25   that was about finding out what he was going to do?

1     A.   Yes.

2     Q.   Okay.  How long did that phone call last?

3     A.   (Pause.)

4     Q.   Look at the record.

5     A.   (Complies.)  It doesn't show.

6     Q.   Was that a call from your cell phone?

7     A.   Yes.

8     Q.   Look in Exhibit 7, see if that provides the

9 duration of time.

10     (Pause to review records.)

11    A.   One minute.

12    Q.   Okay.  And about how long would it take you to

13 make a phone call to Eric to find out what's going on

14 for that evening?

15    A.   Before he answers the phone?

16    Q.   No, how long would your general conversation

17 be with Eric when you're calling him to find out what

18 he's going to do for the evening?

19    A.   One to two minutes.

20    Q.   Okay.  Show you what's marked as Exhibit 14.

21 From the testimony of the Bank of Guam person I put the

22 time of the deposits, which is 1403.  Can you tell me

23 the phone call which occurs immediately preceding that

24 time on the date of the deposit?

25    A.   11:37 a.m.

1    Q.    Okay.  And what phone call is that?

2    A.    I called Eric.

3    Q.    Okay.  And what is the phone call that occurs

4    immediately after that?

5    A.    11:42 a.m.

6    Q.    And who's calling who?

7    A.    Eric called Canovas.

8    Q.    Okay.  How long was the phone call immediately

9    preceding the deposit?

10   A.    The phone call was at 11:42 and the deposit

11   was at 1403, which is 2:03 in the afternoon.

12   Q.    And the phone call that occurred beforehand at

13   11:00, what was -- do you know what the length of that

14   phone call was?  Could you look at Exhibit 7.

15   A.    (Pause to look at documents.)

16         30 seconds.

17   Q.    Okay.  Now, do you recall receiving that phone

18   call?

19   A.    No.

20   Q.    Based on the duration of the phone call, do

21   you have any idea what you might have been talking to

22   him about?

23   A.    No.

24   Q.    Showing you what's marked as Exhibit 13,

25   please take a look at this.  Based on the information

1    from the person at Bank of Guam the deposit is at

2    10:34, the date of the deposit is 12-23.  Can you tell

3    me what the phone call is in the telephone traffic that

4    immediately precedes that date of call?

5         A.    There's none on the 23rd.

6         Q.    Just tell me the date that's reflected that is

7    the call in chronology that first precedes the date of

8    the deposit.

9         A.    12-21-04, 10:34 a.m.

10        Q.    On what day?

11        A.    The 21st.

12        Q.    So, two days beforehand, is that correct?

13        A.    Yes.

14        Q.    Okay.  And who's calling who?

15        A.    I called Eric.

16        Q.    Okay.  Do you have any idea what that phone

17   call may have been about?

18        A.    No, not that I can recall.

19        Q.    Okay.  What about the phone call that

20   immediately follows after that, can you tell us the

21   date and time of the phone call that follows that?

22        A.    12-21-04, 10:36 a.m., Canovas to myself.

23        Q.    Okay.  Do you recall what that phone call was

24   about?

25        A.    No, I don't.

1    Q.    And that -- was that the time day of the
2    deposit?

3    A.    No.

4    Q.    How many days after the deposit?

5    A.    It was about two days before the deposit.

6    Q.    So, can you tell me the phone call that occurs
7    after the deposit?

8    A.    After the deposit was 12-24-04, Aponik to
9    Brian Elm, myself.

10   Q.    Okay.  And do you know what that phone call
11   was about?

12   A.    No.

13   Q.    Okay.  And how long after the deposit was that
14   phone call made?

15   A.    Like a day.

16   Q.    Like a day after?

17   A.    A day.

18   Q.    Showing you what's marked as Exhibit 12, and
19   on Exhibit 12 from the information provided by the Bank
20   of Guam person, I put 1521 p.m. as the time of the
21   deposit shown at the top.  Can you tell me the phone
22   call that is reflected that precedes, immediately
23   precedes the date and time of the deposit, please?

24   A.    11-24-04, 8:14 p.m.

25   Q.    Now what is the time of the deposit?

1    A.    The deposit was made on the 11-26, 1521, which

2    was 3:21 p.m.

3    Q.    Okay.  So, how much time is there between the

4    time of the phone call immediately preceding the

5    deposit and the time of the deposit?

6    A.    Two days.

7    Q.    What's the next phone call that occurs after

8    the deposit?

9    A.    11-24-04, 3:47 p.m.

10   Q.    The date here.

11   A.    Yes.

12   Q.    So this, you said 24?

13   A.    11-27, 10:45.

14   Q.    And that's from whom to whom?

15   A.    That was from Eric Aponik to Canovas.

16   Q.    Okay.  So, do you have any knowledge about

17   what that phone call was about?

18   A.    No.

19   Q.    And you said the one that immediately preceded

20   that was on the 26th at?

21   A.    3:48.

22   Q.    That would be -- this doesn't start -- you're

23   wrong.  Go back here, you've got 11-24, 8:14 p.m.; is

24   that correct?

25   A.    Yes.

1    Q.   Okay.   That's not the day of the deposit, it's

2  a day and a half before that; is that correct?

3    A.   Yes.

4    Q.   Okay.   Then the next call that's shown is on

5  11-26-04 at 3:48 p.m., and that's from whom to who?

6    A.   That was my myself to Aponik.

7    Q.   Okay.   And do you know what that phone call

8  was about?

9    A.   No.

10    Q.   Okay.   If you were with Eric at the time that

11  he made the deposit, why would he have to call you

12  within 20, 30 minutes after that?

13    A.   I don't know.

14    Q.   Okay.   Do you recall what the content of that

15  telephone conversation was about?

16    A.   No.

17    Q.   Showing you Exhibit 11, at the top of the

18  document it shows 11-19-2004 as the date of the

19  deposit, and from the testimony of the lady from the

20  Bank of Guam, it was 10:54 a.m.   Can you tell me the

21  phone call that immediately precedes in the telephone

22  traffic that date and time?

23    A.   (Pause.)   The first telephone call?

24    Q.   If you take the date and time of the deposit

25  transaction.

1     A.    Oh, okay.

2     Q.    The phone call that immediately precedes that

3 date and time in the telephone traffic?

4     A.    That would be 11-19-04, 10:08 a.m.

5     Q.    And who's calling who?

6     A.    Myself calling Aponik.

7     Q.    Okay.  And do you know what that phone call

8 was about?

9     A.    No.

10     Q.    And what is the phone call that immediately

11 follows after that deposit?

12     A.    11-19-04, 11:14 a.m.

13     Q.    So what is the time difference between the

14 time of the deposit and the time of the telephone call?

15     A.    About say 20, 30 minutes.

16     Q.    And who's calling who?

17     A.    Myself calling Aponik.

18     Q.    Okay.  Do you recall what that phone call was

19 about?

20     A.    No.

21     Q.    Showing you what's marked as Exhibit 9, date

22 and time of the deposit transaction that's shown on the

23 top is 11-6-2004, according to the person from the Bank

24 of Guam it was 9:31 a.m.  Can you tell me the phone

25 call that immediately precedes in the chronology that's

1  shown this date and time?

2      A.    11-06-04, 9:22 a.m.

3      Q.    How long before the deposit is that phone

4  call?

5      A.    Nine minutes.

6      Q.    Okay.  And who's calling who?

7      A.    Aponik calling Canovas.

8      Q.    Okay.  Let's go to the phone call that

9  precedes that phone call; what's the phone call shown

10 just before that?

11     A.    11-5-05, 6:33 p.m.

12     Q.    And who's calling who?

13     A.    Aponik calling Canovas.

14     Q.    So for the two phone calls preceding that

15 deposit, one being the night before and one being in

16 the morning, neither one of those involves you; is that

17 correct?

18     A.    That's correct.

19     Q.    So do you have any knowledge about what those

20 phone calls were about?

21     A.    No, I don't.

22     Q.    Okay.  What's the next phone call following

23 that deposit?

24     A.    11-6-05, 12:25 p.m.

25     Q.    And who's calling who?

1    A.    Canovas calling Elm, Brian Elm, me.

2    Q.    Do you recall receiving that phone call?

3    A.    No.

4    Q.    Okay.  Do you recall what that phone call

5    might have been about?

6    A.    No.

7    Q.    Showing you what's marked as Exhibit 10, the

8    date of the transaction shown on the exhibit is

9    11-8-2004, the time of those deposits from the

10   testimony of the Bank of Guam representative was 12:58

11   p.m.  Can you tell me in the telephone traffic which is

12   listed the telephone call which immediately precedes

13   the date and time of this deposit?

14   A.    11-8-04, 12:20 p.m.

15   Q.    Okay, and who's calling who?

16   A.    Myself calling Aponik.

17   Q.    And how long in advance of the deposit was

18   that?

19   A.    About 20 minutes, 20, 30 minutes.

20   Q.    Okay.  And do you recall what that telephone

21   call may have been about?

22   A.    No.

23   Q.    What's the phone call immediately after the

24   deposit?

25   A.    11-8-04, 1:08 p.m.

1    Q.    And who's calling who?

2    A.    Aponik calling Elm.

3    Q.    Okay.  And do you recall what that telephone

4    call was about?

5    A.    No.

6    Q.    Brian, what was the last grade of education

7    you completed?

8    A.    11th.

9    Q.    Where did you complete 11th grade at?

10   A.    Guam Community College.

11   Q.    And in your final semester of school, how many

12   classes did you take?

13   A.    Six.

14   Q.    And what were your grades like?

15   A.    Average.

16   Q.    Well, can you be a little more specific about

17   what you mean by average?

18   A.    A "C", "C" average.

19   Q.    The second to the last semester of high

20   school, how many classes did you take?

21   A.    About the same.

22   Q.    Okay, about six classes?

23   A.    Yes.

24   Q.    And what were your grades like for those

25   classes?

1      A.    About a "C" average.

2      Q.    Let's talk about tenth grade.  What were your

3   grades like in tenth grade?

4      A.    Probably about the same.

5      Q.    About a "C" average?

6      A.    Yes.

7      Q.    What about ninth grade?

8      A.    "B", "C" average.

9      Q.    Brian, have you ever run any businesses?

10     A.    No.

11     Q.    Have you ever worked in any kind of managerial

12  capacity?

13     A.    No.

14     Q.    Have you ever been responsible for operating

15  some business on your own, even though it's not yours?

16     A.    No.

17     Q.    How many times have you been in trouble with

18  the law?

19     A.    I'd say quite a few.

20     Q.    Is that just as an adult?

21     A.    No, when I was a minor.

22     Q.    Tell me some of the things that you've gotten

23  in trouble for.

24     A.    When I was a minor I got in trouble for theft

25  of a motor vehicle, riding a mo-ped without a driver's

1    license or helmet..

2        Q.    What about as an adult?

3        A.    In '95 I was arrested for possession of a
4    controlled substance.

5        Q.    What controlled substance?

6        A.    Meth.

7        Q.    And what happened?

8        A.    I was sentenced to 21 months in federal
9    prison.

10       Q.    Did you go to trial?

11       A.    No.

12       Q.    How was it that you came to be sentenced by
13   the court?

14       A.    I pled guilty.

15       Q.    Why did you plead guilty?

16       A.    Because I was guilty for the possession.

17       Q.    What about after that?

18       A.    In 2003 I was arrested for possession, and
19   unregistered firearm.

20       Q.    And what happened with that case?

21       A.    I pled guilty.

22       Q.    And why did you plead guilty?.

23       A.    Because I was responsible for the possession
24   and the firearms.

25       Q.    And any other times that you've gotten in

1    trouble with the law besides 1995 and 2003?

2        A.    Not that I can recall.

3        Q.    Now, you are charged in this case; why haven't

4    you pleaded guilty?

5        A.    Because I'm not involved.

6        Q.    What do you mean by you're not involved?

7        A.    I just -- I didn't have anything to do with

8    this.

9        Q.    You heard the testimony of your cousin

10   Jarrett, he says he would come to the warehouse and

11   find you smoking; is that true or not true?

12       A.    That's not true.

13       Q.    Is there anything that you think would show

14   that why, when you deny that you weren't smoking, that

15   that's true?

16       A.    I wouldn't -- I wouldn't smoke.

17       Q.    Were there certain things that were occurring

18   that you were required to do that you think show that

19   you weren't using ice?

20       A.    Yes.

21       Q.    What is that?

22       A.    Taking random urine, urinalysis tests,

23   testing.

24       Q.    Ms. Johnson points out that starting in about

25   September of 2004, that the tests were somewhat about

1   two weeks apart. Were you aware of that at that time?

2   A.   No.

3   Q.   Were you able to anticipate when you would be

4   called in?

5   A.   No.

6   Q.   So, did you think you could use ice and get

7   away with it?

8   A.   No.

9   Q.   You've testified about owning two different

10  motorcycles. How many motorcycles in all have you

11  owned over the last several years?

12  A.   Three.

13  Q.   What was the other one that you owned?

14  A.   A 19 -- or a 2001 Yamaha YZFR1.

15  Q.   And where did you get that one from?

16  A.   John Dudkiewicz.

17  Q.   Did you register in your name the ownership of

18  the white 4Runner?

19  A.   No.

20  Q.   Why do you think Eric Aponik has said the

21  things that he has said about you in this case?

22  A.   I really don't know.

23  Q.   Did you call your sister Verlyn?

24  A.   Yes.

25  Q.   How many times did you call your sister Verlyn

1   while you were confined?

2   A.   About less -- less than 10 times.

3   Q.   And when you called her, what did you talk to

4   her about?

5   A.   About the kids and I asked her how she's

6   doing, and stuff like that.

7   Q.   Now, you heard your sister testify that during

8   the last telephone call you made to her, you asked if

9   Eric was really going to follow through with what it is

10  that he was going to testify about; do you recall her

11  testimony about that?

12  A.   Yes.

13  Q.   Why did you -- first of all, did you actually

14  ask her that?

15  A.   Yes, I think so.

16  Q.   Why did you do that?

17  A.   I just wanted to know if he was really going

18  to go through with it, and you know, how he could do

19  that to me.

20  Q.   When you say how he could do that to you, what

21  do you mean?

22  A.   I mean in the earlier calls I would ask him,

23  you know, why he had said the things he said, and he

24  just said, oh, he didn't say it.

25  Q.   So he told you he didn't say what, what led to

1   the charges against you in this case?

2      A.   No.

3      Q.   Are you -- are you disappointed by the fact

4   that Eric has said these things about you?

5          MS. JOHNSON:  Objection; leading question.

6          THE COURT:  Overruled.

7          (Pause while defendant composed himself.)

8   BY MR. VAN DE VELD:

9      Q.   How do you feel about Eric having said these

10   things about you?

11      A.   It really hurts to think that he can do that,

12   say these stuff that aren't true about me.

13      Q.   And how do you feel about what Jarrett has

14   said about you?

15      A.   It hurts.

16      Q.   Why?

17      A.   My own cousin, to lie about me.

18      Q.   Brian, people say that you're a mastermind of

19   criminal activity; what would you say is the truth of

20   those allegations?

21      A.   I'd say it's not true.

22      Q.   Why do you say that?

23      A.   Because I'm changed, I just -- I just want to

24   get past, through this so I can be with my family.

25      Q.   In the previous two times that you've been

1  arrested and you had ice on you, were you dealing ice

2  at those times?

3      A.   No.

4      Q.   Have you ever dealt ice in the past?

5      A.   Yes.

6      Q.   How long ago?

7      A.   11 years ago.

8      Q.   And when you were dealing ice 11 years ago,

9  where did you get the ice from?

10     A.   From Duane Calvo.

11     Q.   Was that from Guam or from some place outside

12  of Guam?

13     A.   From Guam, in Guam.

14     Q.   During the period of time that you were living

15  with Keomi at the end of 2004, and you were assisting

16  her with paying the bills, how would you describe your

17  finances, your financial condition at that time?

18     A.   It was -- it wasn't bad, it was okay.

19     Q.   Did you have a lot of money?

20     A.   No.

21     Q.   Did you own a lot of toys?

22     A.   No.

23     Q.   When you took the rims off of Keomi's car and

24  put the new ones on that you gave her as a gift, did it

25  cost you anything to take those rims then and put them

1    on the white 4Runner when you bought it?

2        A.    No.

3        Q.    The used ones?

4        A.    No.

5        Q.    Why?

6        A.    It was just like a swap off, even swap off.

7        Q.    Okay, so when you put the brand new ones on

8    that you gave her as a gift, those cost you money, is

9    that right?

10       A.    Yes.

11       Q.    But the ones that you took off of there, she

12   already owned them; is that right?

13       A.    Yes.

14       Q.    And then when you transferred them on to the

15   white 4Runner, did you do that work yourself?

16       A.    I remember Eric had helped me in doing that.

17       Q.    Okay.  So it didn't cost you any money?

18       A.    No.

19       Q.    Have you ever made any kind of a wire transfer

20   to anyone in your lifetime?

21       A.    No.

22       Q.    Have you ever been to a Western Union

23   facility?

24       A.    No.

25       Q.    Do you know how you make a wire transfer?

1      A.    No.

2      Q.    Now, do you know how long Eric has run his

3  parents' business?

4      A.    I'm not sure.

5      Q.    Well, how long have you known him that he's

6  been running the business?

7      A.    I'd say within the last two, three years.

8  Three years.

9            MR. VAN DE VELD:  I have nothing further.

10         THE COURT:  All right.  Cross-examination.

11         MS. JOHNSON:  Yes, Your Honor.

12         If I may approach the witness?

13         THE COURT:  Very well.

14         MS. JOHNSON:  These have been marked Exhibits

15  31, 32, and 33.

16             **CROSS-EXAMINATION**

17  BY MS. JOHNSON:

18      Q.    Mr. Elm, can you take a look at Exhibits 31 --

19  Exhibit 31; is that your true name on that document?

20      A.    Yes.

21      Q.    Yes?  Is that you?

22      A.    Yes.

23      Q.    Exhibit 32, is that your name?

24      A.    Yes.

25      Q.    Is that you?

1      A.    Yes.

2      Q.    And Exhibit 33, is that your name?

3      A.    Yes.

4      Q.    Is that you, are you the subject of that?

5      A.    Yes.

6      MS. JOHNSON:  I'd offer 31, 32, and 33.

7      MR. VAN DE VELD:  Without objection, Your

8  Honor.

9      THE COURT:  They'll be admitted.

10  BY MS. JOHNSON:

11      Q.    Mr. Elm, you've just told this jury under oath

12  that when you were found in possession of ice, or meth

13  as you call it, in 1995, you pled guilty to possession

14  and did 21 months in a federal penitentiary; is that

15  true?

16      A.    I pled guilty to distribution.

17      Q.    In fact, you did plead guilty to distribution,

18  didn't you?

19      A.    Yes.

20      Q.    You told this jury that you got that ice from

21  Duane Calvo; is that right?

22      A.    Yes.

23      MS. JOHNSON:  Let me mark this as Exhibit 34,

24  for reference purposes.

25      Q.    Do you remember the plea agreement you entered

```
 1    into when you pled guilty to distribution?

 2         A.    I don't remember it.

 3              MS. JOHNSON:  May I approach the witness, Your

 4    Honor?

 5              THE COURT:  Yes.

 6              MR. VAN DE VELD:  May I see the document

 7    first, Your Honor?

 8                   (Government counsel gives document to

 9                   defense counsel to review.)

10    BY MS. JOHNSON:

11         Q.    I want to call your attention to Page 4, ask

12    you to review this.

13         A.    (Pause to review document.)

14         Q.    Does that refresh your recollection about the

15    plea agreement you entered into when you pled guilty to

16    distribution?

17         A.    Yes.

18         Q.    In fact, you said you'd gotten that ice from

19    Mai Lien Lee, didn't you?

20         A.    .Yes.

21         Q.    Not from Duane Calvo.

22         A.    My mistake.

23         Q.    Were you also dealing ice you got from Duane

24    Calvo?

25         A.    Yes.
```

1    Q.    So you had more than one source of ice?

2    A.    Yes.

3    Q.    When you look at Exhibit 31, is that the

4    conviction that you got in the Superior Court?

5    A.    Yes.

6    Q.    And you were arrested on that charge on

7    September 16 of '03, weren't you?

8    A.    Yes.

9    Q.    And at the time you were down in Tumon by the

10   church, isn't that true?

11   A.    Yes.

12   Q.    And remember when you talked to the officer,

13   you told him that you were going home?

14   A.    Yes.

15   Q.    But you lived in Barrigada, right?

16   A.    Yes.

17   Q.    Do you remember him asking why you were in

18   Tumon if you lived in Barrigada?

19   A.    Yes.

20   Q.    And what did you tell him?

21   A.    I said I was looking for my wallet I had lost.

22   Q.    You were looking for?

23   A.    My wallet.

24   Q.    And what time was it in the morning?

25   A.    About three.