# PAGES 45 THROUGH 48 OF DEFENDANT'S TRIAL TESTIMONY INTENTIONALLY OMITTED

1    parts that's in front of you?

2        A.    Okay.

3        Q.    Does that refresh your recollection as to what

4    you actually bought and what you paid for it?

5        A.    Yes.

6        Q.    And in fact you bought $1800 worth of sound

7    stereo equipment for that vehicle, didn't you?

8        A.    Yes.

9        Q.    In 2003 -- let me go back a little bit.  You

10   said you know Chris Iager; is that right?

11       A.    Yes.

12       Q.    You've known him many years?

13       A.    Yes.

14       Q.    Where is he now?

15       A.    I don't know.

16       Q.    When did he leave Guam?

17       A.    I don't know.

18       Q.    You haven't seen him for over a year, have

19   you?

20       A.    No.

21       Q.    In fact, he left before you went into jail in

22   March of '05, didn't he?

23       A.    I wouldn't know that.

24       Q.    In 2003 and early 2004, isn't it true that

25   Chris Iager was selling ice?

1    A.    I don't know.

2    Q.    You did not know that Mr. Mendiola was sending

3    ice to Chris Iager among other people?

4    A.    No.

5    Q.    To be sold on Guam?

6    A.    No.

7    Q.    Mr. Aponik, I'm sure you've heard his

8    testimony, that he drove you over to Iager's house

9    where you picked up some ice, and then you two went

10   and smoked it; is that true or not?

11   A.    That's not true.

12   Q.    Did you ever get any ice from Iager?

13   A.    No.

14   Q.    Well, where were you getting 7our ice in 2003?

15         MR. VAN DE VELD:  Objection; assumes facts not

16   evidence.

17   BY MS. JOHNSON:

18   Q.    You had a cut straw on your person when you

19   were arrested?

20   A.    2003?

21   Q.    Yeah, 2003, when you were arrested, where did

22   that ice come from?

23   A.    From friends.

24   Q.    What friend?

25   A.    Uh, I don't remember.

1    Q.    You don't remember?

2    A.    No.

3          THE COURT:  Let's take the noon recess.  We'll

4    start up again at 1:00 o'clock.

5                    (Luncheon recess taken at 12:01 p.m.)

6                    (Proceedings resumed at 1:05 p.m.)

7                    (All parties and jurors present.)

8          THE COURT:  Please be seated.

9          All right, Ms. Johnson.

10         MS. JOHNSON:  Thank you, Your Honor.

11   Q.    Mr. Elm, in October of 2004 or thereabouts,

12   Keomi Lujan had a post office box, didn't she?

13   A.    Yes.

14   Q.    And that was at Guam main facility, is that

15   right?

16   A.    Yes.

17   Q.    Do you have a key to it?

18   A.    No.

19   Q.    Why not?

20   A.    She's the one picking up the mail.

21   Q.    So, the post office records would only show

22   that one key had been issued?

23   A.    Yes.

24   Q.    And where did she keep that key?

25   A.    On the keys for the vehicle.

1     Q.   Keys for the what?

2     A.   For her -- for her car.

3     Q.   Now, the drug testing counsel's asked you

4 about, in fact you had a system to beat it, didn't you?

5     A.   No.

6     Q.   When you call early in the morning and be

7 advised that you'd be tested, isn't it true that you

8 drank quarts of water, flushed out your system, and

9 then go in and test clean?

10    A.   No.

11    Q.   You never bragged about that?

12    A.   No.

13    Q.   Did you ever call Mr. Aponik and tell him not

14 to testify against Mr. Espinosa?

15    A.   No, I don't remember that.

16    Q.   You heard the testimony of your cousin,

17 Jarrett Elm, that he came into the Aponik warehouse one

18 day to get a drink from the refrigerator, and there was

19 a table there, and he saw you and Mr. Aponik seated at

20 the table with a scale, digital scale between you, and

21 a packet of ice between you; is that true?

22    A.   No.

23    Q.   Do you know -- what is your relationship with

24 Jarrett Elm?

25    A.   He's my cousin.

1    Q.    And he's about 10 years younger than you,
2    right?
3    A.    Yes.
4    Q.    Are you on good terms?
5    A.    Uhm, yeah.
6    Q.    You've never had a dispute or a falling out?
7    A.    Actually, I would -- would ask him -- uh, no.
8    Q.    No bad blood between you?
9    A.    No.
10    Q.    So, do you know why he would say this about
11    you if it wasn't true?
12    A.    I wouldn't know why.
13    Q.    This white 4Runner you had, you never
14    registered it in your own name, did you?
15    A.    No.
16    Q.    Why not?
17    A.    I'm -- I'm not sure why.
18    Q.    Chris Iager, you've denied that you were
19    dealing ice for him during 2003 and 2004; is that
20    correct?
21    A.    Yes.
22    Q.    Did you ever brag to Mr. Aponik that you were
23    moving 10 to 20 grams a week for Mr. Iager?
24    A.    No.
25    Q.    You know Albert Mendiola, however, right?

1    A.   Yes.

2    Q.   You knew he was in Las Vegas?

3    A.   No, I didn't know he's in Las Vegas.

4    Q.   So you didn't even know where he was?

5    A.   No.

6    Q.   What is Mr. Iager's phone number?

7    A.   I can't remember.

8    Q.   Did he have a cell phone?

9    A.   I believe so.

10   Q.   Excuse me?

11   A.   Yes.

12   Q.   Okay.  And is it true that when you were

13   helping Mr. Aponik renovate his warehouse, that

14   Mr. Iager would come over there and the three of you

15   would smoke ice together?

16   A.   That wasn't true.

17   Q.   And is it not true that you gave Jarrett Elm

18   ice and shared it with him?

19   A.   No.

20   Q.   Exhibit 7 is an analysis of your phone

21   records, calls in, calls out.  Out of curiosity, whose

22   phone is 472-5828?

23   A.   That would be my sister's.

24   Q.   Which sister?

25   A.   Verlyn Aponik.

```
1        Q.    Who?

2        A.    Verlyn Aponik.

3        Q.    Mr. Aponik's wife?

4        A.    Yes.

5        Q.    Okay.  Who belongs to 828-1041?

6        A.    That would be my cousin Katrina, where she

7   works, that's her store in Merizo.

8        Q.    How about 678-4038?

9        A.    I -- I don't know.

10       Q.    How about 637-2117?

11       A.    That's my uncle Allan Elm's number.

12       Q.    How about 678-4038?

13       A.    I don't remember that number.

14       Q.    How about 689-9774?

15       A.    I don't remember that number.

16       Q.    How about 787-6461?

17       A.    I don't remember that number.

18       Q.    688-2038?

19       A.    I don't remember that number.

20       Q.    How about 472-5824?

21       A.    I don't know.

22       Q.    And yet you say you were calling all these

23   people, friends and relatives just to chat with them?

24       A.    Yes.

25       Q.    If we go through these records, how many times
```

1  will we find calls to Chris Iager during this five-
2  month period?
3      A.   I wouldn't know.
4      Q.   Will we find any calls to Mr. Iager from you?
5      A.   I don't know.
6      Q.   You can't remember calling him at all?
7      A.   (Pause.)  I'm not sure.
8      Q.   You're not sure if you called him?
9      A.   Yes.
10     Q.   If you had, would it be fair to say that it
11 wasn't that often, or you would remember it?
12     A.   Yes.
13     Q.   So we'd find very few calls from you to
14 Mr. Iager, if any, is that right?
15     A.   Yes.
16     Q.   The cell phone that you got October 1st; had
17 you ever had one before?
18     A.   No.
19     Q.   Why did you get one at that particular time,
20 October 1st of 2004?
21     A.   To communicate with Keomi.
22     Q.   And what had you done to communicate with her
23 all the years before that?
24     A.   I would just call her from work or from home.
25     Q.   So why the pressing need for a cell phone as

1  of that date?

2      A.   No reason.

3      Q.   Excuse me?

4      A.   No reason.

5      Q.   There's no reason.  And did you ask her to get

6  the cell phone for you?

7      A.   Yes.

8      Q.   And you ran up hundreds of dollars worth of

9  bills on it because were you bored; is that your

10 testimony?

11     A.   Yes.

12     Q.   How could you afford that kind of bills for

13 this cell phone?

14     A.   The bills came out, I believe, in every month.

15     Q.   Uh-huh.

16     A.   And I would pay for it.

17     Q.   So from the testimony that you and Ms. Lujan

18 have given, you are certainly not wealthy people?

19     A.   Right.

20     Q.   In fact, you appear to be watching every penny

21 that you spend, right?

22     A.   On and off, yes.

23     Q.   You were frugal, is that correct?

24     A.   Yes.

25     Q.   And yet you took out a cell phone and you ran

1  up almost $900 worth of bills and you can't tell us

2  why; is that correct?

3      A.    That's over a five-month period.

4      Q.    Yes.

5      A.    Yes.

6      Q.    Over a five-month period?

7      A.    Yes.

8      Q.    You talked about Exhibit 26, those are the

9  calls to and from Mr. Canovas's phone.  Before you got

10 your cell phone, had Mr. Canovas ever called you just

11 to chat?

12     A.    I'm not sure, no.

13     Q.    Well, he was living in Las Vegas at the time,

14 wasn't he?

15     A.    Yes.

16     Q.    And wouldn't it be kind of unusual, I mean,

17 your only connection was through your cousin Derek; is

18 that right?

19     A.    Yes.

20     Q.    And so wouldn't it be unusual for him to call

21 you and run up a bill just chatting with you?

22     A.    Yes.

23     Q.    It'd be more likely he'll call Derek, right,

24 if he was going to call anybody?

25     A.    But my cousin Derek wasn't on island, so --

1    Q.   Okay.  So there's no reason for him to call

2    Guam at all, would that be correct?

3    A.   Yes.

4    Q.   And do you recall the barbecue when he was

5    home for the summer after summer school had let out?

6    A.   I -- vaguely.  I don't recall.

7    Q.   You don't recall that barbecue?

8    A.   No.

9    Q.   And did you ever ask him to send you ice so

10   that you could begin distributing it yourself?

11   A.   No.

12   Q.   Counsel asked you about these phone calls.

13   For example, the first one that the records show is

14   from Las Vegas, Mr. Canovas's phone, directly to you at

15   1238.  What happened during that phone call?

16   A.   I can't remember.

17   Q.   Well, you testified on direct that he was

18   looking for Eric Aponik; is that true?

19   A.   Yes.

20   Q.   So you do remember when was looking for

21   Mr. Aponik?

22   A.   Yes.

23   Q.   And that's your testimony?

24   A.   Yes.

25   Q.   He didn't call you to tell you that a package

1    of ice was on the way?

2         A.    No.

3         Q.    And what did you -- did he ask for you to

4    convey a message to Mr. Aponik?

5         A.    Certain times, yeah, he'll ask me to just let

6    him know he called or that he'll call him back, he'll

7    try and call back to see if he answers his phone or --

8         Q.    Why was he calling you at all?

9         A.    I don't know.

10        Q.    Why wouldn't he call Mr. Aponik directly?

11        A.    I don't know.

12        Q.    And leave a message?

13        A.    I don't know.

14        Q.    The next call -- we have a deposit here

15   October 13, $1,000 in the Bank of Guam, and then on

16   October 14 he's calling you again; do you remember why?

17        A.    No.

18        Q.    Was it to ask for Mr. Aponik?

19        A.    Could be, yes.

20        Q.    You don't know?

21        A.    (No response.)

22        Q.    But it was not to discuss drugs?

23        A.    Right.

24        Q.    Or proceeds?

25        A.    No.

1    Q.   On the 25th, he calls you twice; do you
2  remember what these calls were about?
3    A.   No.
4    Q.   On October 25 there was another deposit into
5  the Bank of Guam, and then for the first time in these
6  records on October 29 there's a call from Aponik's
7  phone to him.  Mr. Aponik said that you were using his
8  phone to call Las Vegas because he had long distance
9  service; is that true?
10   A.   That's not true.
11   Q.   You were not using his phone?
12   A.   No.
13   Q.   Never ever?
14   A.   No.
15   Q.   Some of these calls look as if they're return
16  calls.  For example, October 30th, Aponik's phone is
17  used to call Mr. Canovas, but when he calls back, he
18  calls you, not Mr. Aponik.  Do you know why that would
19  be?
20   A.   I don't know why.
21   Q.   Another example, November 9, Aponik's phone is
22  used to call Canovas at 1116, and 20 minutes later he's
23  calling back, but he's not calling Mr. Aponik, he's
24  calling you; why would that be?
25   A.   I -- I don't know.

62

Q. You had no business between the two of you, did you?

A. No.

Q. So other than drugs, what would this phone call be about?

A. Probably looking for Eric, or -- I don't know.

Q. Why wouldn't he -- he obviously has Mr. Aponik's phone number; why wouldn't he just call Mr. Aponik?

A. I don't know.

Q. And why would he think that you would know where Mr. Aponik was?

A. Because we're usually together.

Q. Because what?

A. We're usually together.

Q. So, he's not calling in response to a call from you?

A. No.

Q. When you go through Exhibit 4, Mr. Aponik's records, you never see a phone call from Las Vegas to Mr. Aponik directly, not a single one; can you explain that?

A. Could you repeat that?

Q. When you look at Exhibit 4, and you scan page after page of records, you see Mr. Aponik's phone being

Wanda M. Miles
Official Court Reporter
Case 1:07-cr-00026    Document 28-2    Filed 06/19/2007am    Page 15 of 25

1   used to call Las Vegas, being used to call Mr. Canovas,

2   and we see Mr. Canovas calling you.  There is not a

3   single record of Mr. Canovas calling Mr. Aponik; do you

4   know why that is?

5        A.   I don't know why.

6        Q.   Now John Cruz said that he heard through your

7   cousin Derek that you were dealing ice and he gave you

8   a call and he purchased a gram from you at Gogue's

9   Market; is that true?

10       A.   That's not true.

11       Q.   And he said that the next time it was two

12  grams, and it was from your residence; is that true?

13       A.   That's not true.

14       Q.   He said that he was buying ice from you on an

15  almost daily basis; is that true?

16       A.   No.

17       Q.   Now, Mr. Cruz is not a friend of yours, is he?

18       A.   Yes.

19       Q.   Well, he's not a very close friend, is he?

20       A.   No.

21       Q.   I mean, you see him when you go down to Merizo

22  for barbecues; right?

23       A.   Yes.

24       Q.   And that's about it, right?

25       A.   Yes.

1    Q.   Is there any bad blood between you?

2    A.   No.

3    Q.   Do you know why he would say this about you if

4    it wasn't true?

5    A.   I wouldn't know why.

6    Q.   Now, counsel had asked you about the phone

7    calls that Mr. Cruz was making, and you said that each

8    time Mr. Cruz was calling you to ask where Eric was; is

9    that right?

10   A.   Yes.

11   Q.   Okay.  So when we look at Exhibit 28, for

12   example, we see on November 6 he called you at 2:13

13   2:47, and 7:31 in the evening.  Are all three of these

14   calls to ask where Mr. Aponik is?

15   A.   Sometimes my brother B.J. would use his phone

16   to call me, since they both stay in Merizo.  So most of

17   those, some of those calls are from my brother, B.J.

18   Elm.

19   Q.   Why would he be calling on Mr. Cruz's phone?

20   A.   They hang out together.

21   Q.   Didn't B.J. have his own telephone?

22   A.   No.

23   Q.   Who was he living with?

24   A.   Uh, with his girlfriend.

25   Q.   He didn't have a telephone?

1      A.    I wouldn't know that.

2      Q.    What?

3      A.    I don't know.

4      Q.    So now you're saying that these calls from

5   Cruz to you were not necessarily to look for

6   Mr. Aponik, but they were from your brother?

7      A.    Yes.

8      Q.    How many of them are from your brother?

9      A.    I don't know.

10      Q.    What was your brother talking about?

11      A.    Just checking what I'm doing.

12      Q.    Why would your brother be calling within half

13   an hour of the previous call?

14      A.    I don't know.

15      Q.    We see many times in this record, for example,

16   on January 21st of '05 you were calling Mr. Cruz.  Why

17   were you doing that?

18      A.    Probably to ask if my brother was with him.

19      Q.    Probably?

20      A.    Yes.

21      Q.    You can't remember?

22      A.    No.

23      Q.    And you didn't know your brother's

24   girlfriend's telephone number?

25      A.    No.

1    Q.   And we see what appears to be return calls;

2   for example, on February 12, Mr. Cruz calls you at

3   12:24, and within the hour you're returning his call.

4   Why?

5    A.   I don't know.

6    Q.   Why would you be calling Mr. Cruz if it were

7   not concerning drugs?

8    A.   Probably for my brother.

9    Q.   So in effect you're saying that all of these

10  are calls to or from your brother on Mr. Cruz's

11  telephone; is that right?

12   A.   Yes.

13   Q.   Why would Mr. Cruz let him use his telephone

14  and run up a bill on his phone?

15   A.   I don't know.

16   Q.   Now Mr. Aponik has said that shortly before

17  you went to jail that you introduced him to Mr. Cruz

18  and put them together so that they could continue this

19  drug operation; is that true?

20   A.   That's not true.

21   Q.   And yet the very first call that we see from

22  either Aponik to Cruz or Cruz to Aponik does not occur

23  until March 15, three days before you go into jail.

24  Can you explain that?

25   A.   I can't.

1   Q.   What?

2   A.   I can't.

3   Q.   No.  Is there any bad blood between you and

4   Mr. Canovas?

5   A.   Not that I -- no.

6   Q.   Do you know why he'd be saying this about you

7   if it weren't true?

8   A.   I wouldn't know why.

9        MS. JOHNSON:  Thank you.  I have nothing

10  further.

11       THE COURT:  Redirect.

12       MR. VAN DE VELD:  Let the record reflect that

13  I'm showing the witness Exhibit No. 4 and directing his

14  attention to page 39 center of the page.

15                    **REDIRECT EXAMINATION**

16  BY MR. VAN DE VELD:

17   Q.   Ms. Johnson said that there were no phone

18  calls from Eric Aponik's phone to Mr. Canovas.  Can you

19  tell me what the date is that it shows in Exhibit 4?

20       MS. JOHNSON:  Objection.  Misstates the

21  question, it was Canovas to Aponik.

22       THE COURT:  Rephrase the question.

23  BY MR. VAN DE VELD:

24   Q.   Can you please take a look at Exhibit No. 4

25  and tell me what it is that you find in the center of

68

1    the page?

2        A.    Says here Las Vegas.

3        Q.    Okay.  And what number is calling, is placing

4    the call according to these charts?

5        A.    777-6211.

6        Q.    Okay.  And what number is being called?

7        A.    702-491-9712.

8        Q.    You have the cell phone records of John V.

9    Cruz?

10       A.    No.

11       Q.    Do you have the cell phone records of Jonathan

12   Canovas's prepaid phones?

13       A.    No.

14       Q.    So, would it be accurate to say that you don't

15   know whether or not there were phone calls from those

16   people to Mr. Aponik?

17       A.    Yes.

18       Q.    Showing you what's marked as Government's

19   Exhibit 31.  You indicate that back in 1995 that you

20   had been charged with possession; do you recall that

21   part of your testimony?

22       A.    Yes.

23       Q.    Okay.  And at a further part in your testimony

24   you indicated that 11 years ago you were distributing

25   ice; is that correct?

1     A.    (Nodding.)

2     Q.    Okay.  If you look at Exhibit 30 -- was it 32

3  I gave you?  I'm sorry.

4     A.    31.

5     Q.    31.  Do you know whether or not the charge

6  that you actually pled guilty to was possession with

7  intent to distribute?

8     A.    No.

9     Q.    Okay.  What was the charge that you actually

10  pled guilty to?

11     A.    Distribution of methamphetamine.

12     Q.    Okay.  And that was how many years ago?

13     A.    11.

14     Q.    Do you know how Eric Aponik received mail

15  before he got his post office box in November of 2004?

16     A.    I think it was his dad's mailbox.  I'm not

17  sure.

18     Q.    And he also at that time was working at

19  Reaction Company; is that correct?

20     A.    That's correct.

21     Q.    (Pause.)  When you called your sister Verlyn

22  at 472-5828, were you calling her to talk to her about

23  drugs?

24     A.    No.

25     Q.    When you called your cousin Katrina at

1    828-1061, were you calling her to talk to her about

2    drugs?

3         A.    No.

4         Q.    When you called 637-2117 to talk to your Uncle

5    Allan, were you talking to him about drugs?

6         A.    No.

7         Q.    So there's lots of phone calls that you've

8    made, isn't that correct?

9         A.    Yes.

10        Q.    And were any of them about drugs?

11        A.    No.

12             MR. VAN DE VELD:  Nothing further.

13             THE COURT:  Recross.

14             MS. JOHNSON:  Nothing further, Your Honor.

15             THE COURT:  All right.  You may step down.

16             MR. VAN DE VELD:  Your Honor, I have the 2005

17   Guam Island Telephone Directory I would like the court

18   to take judicial notice of.

19             THE COURT:  Any objection?

20             MS. JOHNSON:  For what purpose?

21             MR. VAN DE VELD:  The purpose is to show the

22   address of J. C. Marketing, which is the business owned

23   and operated by Mr. Canovas's parents.

24             MS. JOHNSON:  Can we not stipulate to that?

25             THE COURT:  Why don't you see it, counsel, and

1   you can agree upon the address.

2            (Pause while counsel conferred.)

3            MS. JOHNSON:  No objection, Your Honor, we'll

4   stipulate that J. C. Marketing was at the City Air

5   Plaza, 1700 Route 16 in Dededo.

6            THE COURT:  All right.

7            MR. VAN DE VELD:  Your Honor, I'd further like

8   the court to take judicial notice that under the

9   sentencing guidelines that if a person is found to be a

10  manager, leader, or organizer of a drug activity, that

11  there is a corresponding increase in the offense level

12  which affects the sentence recommendation that's made

13  to the court by the sentencing guidelines, by

14  increasing that sentencing recommendation.

15           THE COURT:  Any objection to that?

16           MS. JOHNSON:  No.

17           THE COURT:  All right.

18           MR. VAN DE VELD:  Further, that under those

19  same sentencing guidelines that if you are found to be

20  an organizer, leader, or manager of an activity

21  involving drugs, you are not able to get the two-level

22  reduction for the safety valve which also is a basis

23  for allowing a departure -- excuse me -- the court to

24  not impose a sentence under the mandatory minimums of a

25  statute under Section 3553(e) of Title 18 of the United

1    States Code.

2             MS. JOHNSON:  No objection.

3             THE COURT:  All right.

4             MR. VAN DE VELD:  At this point in time, Your

5    Honor, defense rests.

6             (End of requested transcript.)

7                            * * *

8

9

10                   CERTIFICATE OF REPORTER

11

12   CITY OF AGANA        )
                          ) ss.
13   TERRITORY OF GUAM    )

14

15            I, Wanda M. Miles, Official Court Reporter

16   of the District Court of Guam, do hereby certify the

17   foregoing pages 1-71, inclusive, to be a true and

18   correct transcript (excerpt) of the shorthand notes

19   taken by me of the within-entitled proceedings, at the

20   date and time therein set forth.

21            Dated this 24th day of October, 2006.

22

23            *Wanda M. Miles*

24

25


                    Wanda M. Miles
                 Official Court Reporter